**Mary BOLT, Plaintiff,**

v.

**Robert L. HICKOK, Jr., M.D., Robert L. Hickok, Jr., M.D., P.A., and Associates in Obstetrics & Gynecology, P.A., a Delaware corporation, Defendants.**

Civ. A. No. 93–327 MMS.

United States District Court,
D. Delaware.

May 5, 1995.

Ben T. Castle, Melanie K. Sharp, Young, Conaway, Stargatt & Taylor, Wilmington, DE, for plaintiff.

Joanne B. Wills, Joseph R. Slights, III, Morris, James, Hitchens & Williams, Wilmington, DE, for defendants.

## *OPINION*

SCHWARTZ, Senior District Judge.

## I. INTRODUCTION

Plaintiff Mary Bolt filed this diversity action against Robert L. Hickok, Jr., M.D., and his professional corporation, Robert L. Hickok, M.D., P.A., alleging medical malpractice in connection with his obstetrical care in the delivery of Mrs. Bolt's baby. After an emotionally charged five day trial, a nine-membered jury rendered a verdict in favor of defendants. Plaintiff Mary Bolt has now moved for a new trial, grounded on any or all of four possible bases: 1) a member of the jury was prejudiced from the outset, 2) the verdict was not the unanimous verdict of the entire jury, 3) the jury was unfairly influenced by misconduct of defense counsel, and 4) the verdict was against the great weight of the evidence.

After carefully reviewing the trial record, for the reasons that follow, the Court will deny plaintiff's motion for a new trial.

## II. FACTUAL BACKGROUND

Evidence adduced at trial showed that in 1963, at age thirteen months, plaintiff Mrs. Mary Bolt was diagnosed with a rare, often fatal form of cancer known as rhabdomyosarcoma. Docket Item ("D.I.") 107 at 115. The cancer manifested itself as a tumor located on her external genitalia, specifically on her left vulva. The tumor was surgically excised from the infant Bolt, and radiation anti-cancer therapy was ordered as follow-up. Her physicians then implanted radium needles approximately one inch in length into her left vulva to irradiate any cancerous tissue possibly remaining; the evidence showed it was likely no measures were taken to shield the infant Bolt's surrounding pelvic anatomy from the effects of the radiation.

Fortunately, the treatment of plaintiff's rhabdomyosarcoma proved successful in eradicating the cancer. Mrs. Bolt matured into adulthood, married, and became pregnant at 28 years of age. Her first prenatal medical appointment was on November 29, 1990, during which she met the defendant obstetrician, Robert L. Hickok, M.D. Plaintiff's Exhibit ("Pltf's Exh.") 1. As Mrs. Bolt had not been a patient of Dr. Hickok's prior to her pregnancy, he elicited plaintiff's medical history, including her radiation treatment for cancer during infancy.

Over the course of her pregnancy, Mrs. Bolt reported to Dr. Hickok for eleven more prenatal examinations. D.I. 109 at 451. Hickok recommended a vaginal delivery, as opposed to a Caesarean section, for delivery of Mrs. Bolt's baby. Plaintiff, a nursing instructor, expressed concern regarding her history of vulvar cancer and its effect on her reproductive anatomy; Dr. Hickok assured her that he would "just keep an eye on things." D.I. 108 at 301–02.

On July 15, 1991, at the Medical Center of Delaware, Hickok supervised the labor and vaginal delivery of plaintiff's baby. Plaintiff's husband, Dan Bolt, also attended the delivery, providing moral support while positioned at plaintiff's head. In the final stage of plaintiff's labor, Dr. Hickok deemed it prudent to perform an episiotomy, a surgical incision to widen the mouth of the birth

canal. This local procedure, routinely performed, was done to prevent an uncontrolled, more traumatic tearing of plaintiff's vaginal membranes by the passage of the baby during delivery. D.I. 110 at 636. Mindful of plaintiff's childhood irradiation of her left vulva, Hickok cut only into the tissue on the right side of plaintiff's vaginal opening. Hickok also used forceps to aid the baby's delivery; plaintiff testified that her newborn son sustained bruises and cuts on his head from the delivery. D.I. 109 at 327. From plaintiff's and her husband's perspectives as first-time parents, the delivery was difficult and exhausting. In Dr. Hickok's view, the level of difficulty endured by plaintiff in labor and delivery was not unusual.

Mrs. Bolt was discharged home three days later with instructions to apply ice packs to her vaginal area to relieve soreness. On July 21, six days after delivery, Bolt observed that her episiotomy area had turned yellow, gray, and black. *Id.* at 329–30. Upon further self-examination, Bolt realized she was running a higher than normal temperature. *Id.* As a nurse, Bolt recognized these as symptoms of a fulminating infection. She immediately called Hickok's office, where the physician covering emergencies ordered Bolt to meet him at the hospital immediately. *Id.* at 330.

Hickok's associate, Dr. James Bradfield, examined plaintiff and confirmed the presence of infection at her episiotomy site. His chief concerns were whether the infection had spread to Bolt's surrounding structures, such as her anus and rectum, and how he should approach cleaning and debridement[1] of the wound. In his experience as a gynecologist, Dr. Bradfield had witnessed the rapid deterioration and death of two obstetrical patients due to infection spreading deeper into their surrounding soft tissue. D.I. 110 at 583. Additionally, if plaintiff's episiotomy infection encroached into non-gynecologic anatomy, Bradfield would not have been surgically competent to handle it alone. He consulted with a general surgeon, who examined plaintiff and found the infection to be local, involving primarily the tissues surrounding the episiotomy wound.

Bradfield operated on plaintiff to debride and drain her purulent episiotomy wound. As he probed among the infected tissue, he confirmed the general surgeon's assessment that the infection did not involve the rectum or anal sphincter. *Id.* at 593–94. After a four day hospital stay, plaintiff was discharged home, where she recuperated with daily visits by a home health care nurse. She suffered no further infectious type complications.

As she convalesced, Bolt noticed some abnormal bulging of tissue from her vaginal orifice. D.I. 109 at 335–36. During subsequent post-partum visits with Hickok, she inquired what this condition was and what could be done about it. Hickok diagnosed plaintiff as having a cystocele and rectocele, which meant that her internal organs were prolapsed (protruding) out of her vaginal opening. D.I. 107 at 136–39. Plaintiff testified that Hickok recommended she just "live with it," at least until she was finished having children, an appraisal plaintiff found unacceptable. D.I. 109 at 337, 493. She sought out other physicians' advice and discontinued seeing Hickok as her obstetrician-gynecologist. *Id.* at 339. During the trial, plaintiff admitted into evidence several 5 × 7 inch color photographs of her vaginal and rectal anatomy, displaying in graphic detail the extent of her disfigurement. Pltf's Exh. 11–15, 18–22.

In November, 1991, Bolt started experiencing profound manifestations of her rectocele and cystocele: urinary, flatus (gas) and stool incontinence, which persist even up to now. D.I. 109 at 342. Needless to say, plaintiff has altered her lifestyle in an attempt to cope with her incontinence, which was and remains completely unpredictable and at times physically painful. Both plaintiff and her husband presented riveting testimony of the physical and emotional toll her debilitation has exacted on their marriage and plaintiff's self-image. Bolt also produced experts who testified about the prognosis for restoration of her anatomy.

---

1. Debridement involves the surgical excision of dead or contaminated tissue from a wound. Webster's II New Riverside University Dictionary at 351 (1984).

Plaintiff had severed all contact with Dr. Hickok in the fall of 1991. D.I. 109 at 338. Hickok was unaware of plaintiff's incontinence until she filed her complaint alleging medical malpractice. *Id.* at 493. At trial, plaintiff proceeded under the theory that Hickok's vaginal delivery violated the relevant medical standard of care and that Hickok should have delivered her baby by Caesarean section. Plaintiff's experts testified that because Bolt sustained radiation damage to her vulva and vagina, Hickok should have known her tissues were not healthy enough to withstand a vaginal delivery. Plaintiff's experts testified to a reasonable medical probability that Hickok's course of treatment as to Mrs. Bolt deviated from acceptable medical standards of obstetrical care and was thus malpractice. *See, e.g.,* D.I. 107 at 140. Plaintiff's experts unanimously endorsed Caesarean section as the proper mode of delivery that should have been utilized.

Two physician experts testified on behalf of defendants. Both agreed that Dr. Hickok's decision to deliver plaintiff's baby vaginally was within the appropriate medical standard of care for obstetricians, D.I. 110 at 643, 714–15, and that the prospective risks of Caesarean section would have outweighed those of a vaginal delivery. *Id.* at 633, 640, 713–15. After deliberating approximately 90 minutes, the jury rendered a verdict in favor of defendants.

## III. DISCUSSION

### A. Standards for the Granting of a New Trial

The court may grant a new trial "to all or any of the parties and on all or part of the issues ... in an action where there has been trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the court of the United States." Fed.R.Civ.P. 59(a). Plaintiff has advanced an array of arguments for the granting of a new trial, each of which will be addressed in turn.

#### 1. Juror Prejudice

■ In her first argument for a new trial, plaintiff contends that one of the nine

jurors should have been excused prior to trial after it became evident he had ties to the medical community. The law allows the grant of a new trial if a juror was prejudiced from the outset of the case. *King–Size Publications, Inc. v. American News Co.,* 194 F.Supp. 109 (D.N.J.), *cert. denied,* 368 U.S. 920, 82 S.Ct. 242, 7 L.Ed.2d 136 (1961); 11 Charles Alan Wright and Arthur Miller, *Federal Practice and Procedure* § 2810 (1973). Plaintiff challenges the impartiality of Juror Tim Cross, based on his family and business connections to several physicians. At the voir dire of the venire panel, Mr. Cross told the Court that he had prior business experience managing an ophthalmic surgery center for two years, and also had managed an ear, nose and throat center for six months. D.I. 107 at 16. Cross further stated that he had run an orthopedic implant company for about two years, and that his father had been a pediatrician for fifty years. *Id.* at 16, 20. Upon additional probing by the Court, Cross stated that he had never dealt with radiation implants, and that any contacts with radiologists were "just in the business sense." *Id.* at 17. Cross was but one of many venirepersons with ties to the medical professions; one panel member had extensive nursing experience in obstetrics and gynecology. *Id.* at 16. *See id.* at 14–19 (venirepersons related by blood or marriage to doctors, nurses, pharmacists; venirepersons employed by hospitals and physicians as nurses or secretaries).

Following the colloquy with Cross, the Court asked the panel several questions designed to elicit any bias or prejudices held by any venireperson. The Court first inquired whether any member of the panel had "preconceived opinions or attitudes about medical malpractice cases that would interfere with your ability to render a fair and impartial verdict either for a physician or against a physician if the evidence warranted such a verdict?" *Id.* at 21. No member of the panel, including Cross, answered affirmatively. The Court then asked whether any panel member had "any prejudice against persons who file lawsuits seeking to recover money damages for personal injuries caused by the negligence of another?" *Id.* at 22. Again, no prospective jurors answered affirmatively. Finally, the Court asked whether any of the

panel felt he or she "would not be able to reach a fair and impartial verdict based solely on the evidence as produced from the witness stand and the instructions on the law...." *Id.* at 23. Again, no one answered affirmatively.

At the close of voir dire, plaintiff moved to challenge Cross for cause, based on his involvement with physicians from both business and familial standpoints. *Id.* at 27. The Court denied this application. Fifteen of the venirepersons were then randomly selected as prospective petit jurors, including Cross and the obstetrical nurse. Both litigants exercised their Rule 47(b) peremptory strikes. Although she had three opportunities to do so, plaintiff struck neither Cross nor the nurse. Both were sworn onto the petit jury, with Cross situated as Juror 7. *See* Correspondence file, Juror record, CA 93–327.

■ The principal inquiry in the determination of whether a juror should be stricken for cause is whether the juror "holds a particular belief or opinion that will 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions or oath.'" *Kirk v. Raymark Indus., Inc.,* 51 F.3d 1206, 1209, (3d Cir. April 14, 1995) (quoting *United States v. Salamone,* 800 F.2d 1216, 1226 (3d Cir.1986); *see also United States v. Calabrese,* 942 F.2d 218, 222–23 (3d Cir.1991); 28 U.S.C. § 1866(c). A juror is impartial if he can put aside any previously formed opinion or impression going to the merits of a case and can render his verdict based solely on evidence presented at trial. *United States v. Polan,* 970 F.2d 1280, 1284 (3d Cir.1992) (citing *Irvin v. Dowd,* 366 U.S. 717, 726, 81 S.Ct. 1639, 1644, 6 L.Ed.2d 751 (1961)), *cert. denied,* —— U.S. ——, 113 S.Ct. 1367, 122 L.Ed.2d 745 (1993). The determination whether a prospective juror can render a fair and impartial verdict lies within the trial court's province and is reversible only if there has been an abuse of discretion. *Polan,* 970 F.2d at 1284.

■ Jurors are presumed to answer truthfully to questions asked at voir dire. *United States v. Copple,* 24 F.3d 535, 544 n. 14 (3d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 488, 130 L.Ed.2d 400 (1994). Here, Juror Cross and his fellow panel members swore or affirmed to answer the propounded questions truthfully, and there is no evidence suggesting Cross was less than candid with any answers he gave to the Court. He addressed the Court when a question asked of the entire venire panel applied to him and unhesitantly answered further inquiries directed specifically to him. There was nothing in his demeanor to imply a lack of veracity. When asked a number of questions relating to his attitudes, opinions, prejudices, and impartiality, Cross did not indicate that he could not perform the sworn duties of a juror as instructed. Similarly, none of the other panel members with analogous ties to or actual expertise in health care disciplines expressed any views implicating any bias or prejudice.

■ After evaluating the answers to voir dire given by Cross, I, in my discretion, declined to excuse him when plaintiff moved to challenge him for cause. In so doing, I looked beyond his sworn assurances of impartiality. *See Kirk,* 51 F.3d at 1206 (a "district court should not rely simply on the jurors' subjective assessments of their own impartiality"). There was no evidence that Cross possessed independent medical knowledge relating to the medical issues in this trial; none of his previous ties to the medical community even remotely involved obstetrics and gynecology. Any prior contact with radiologists involved x-rays and interpretive films; Cross had no experience with radiation therapists, *i.e.,* as those who treat cancer with radiation, an entirely different discipline. Moreover, it is well settled that the mere existence of personal or family contacts to someone in a profession or circumstance similar to that of one of the parties, without more, is not a basis to strike for cause. *See United States v. Beasley,* 48 F.3d 262 (5th Cir.1995) (juror whose brother was police chief and son was police officer not stricken for cause in criminal trial), *United States v. Nururdin,* 8 F.3d 1187 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1328, 127 L.Ed.2d 676 (1994) (jurors' mere relationship to a law enforcement officer insufficient ground to strike for cause in criminal trial); *United States v. Nazarenus,* 983 F.2d 1480

(8th Cir.1993), *cert. denied,* 114 S.Ct. 1328 (1994) (same). I credited his sworn answers to voir dire as truthful; there was no reason to question his ability to give impartial consideration to the evidence to be presented at trial and render a fair verdict.

In re-examining the record in the unhurried calm of chambers, I am unable to reach a different conclusion regarding Cross's fitness to serve as a juror. Accordingly, I will deny plaintiff's motion for a new trial as to this ground.

### 2. Unanimous Verdict

■ Plaintiff also argues that a new trial is warranted because the "verdict of the jury was not unanimous." D.I. 118 at 2. As is the custom of this Court, at the close of the evidence, the jury was instructed to deliberate by talking to each other, making every reasonable effort to reach unanimous agreement. D.I. 113 at 769. Each juror was instructed to "not ever change your mind just because other jurors see things differently, or just to get the case over with." *Id.* at 770. In addition, the jurors were told to "reach unanimous agreement, but only if you can do so honestly and in good conscience," and admonished to "not under any circumstances allow any sympathy to influence you in any degree whatever in arriving at your verdict." *Id.* Finally, the jurors were instructed "it is necessary that each juror agree to the verdict. Your verdict must be unanimous." *Id.* at 771.

The Court having instructed the jurors on the law and their role in considering the evidence, counsel proceeded with their closing arguments. At 12:44 p.m., the jurors commenced deliberations; they were also served sandwiches at that time. At 2:20 p.m., the jury returned its verdict for defendants in open court. As the Court thanked the jurors for their attentiveness in this unusual and emotionally charged trial, Patricia Martone, Juror 4, was visibly upset and crying openly. D.I. 114 at 3. Witnessing the juror's distress, counsel for plaintiff requested a jury poll. When asked whether the verdict for defendants was one with which she agreed, Martone replied, "Yes." *Id.*

Each juror confirmed the unanimity of the verdict for defendant.

After the jury poll, plaintiff's counsel requested a sidebar conference, at which she wondered whether Martone "felt free to answer frankly the polling question," and asked for an opportunity "to explore why she is upset." *Id.* at 4. The Court summoned Martone to sidebar as well, where the following exchange took place:

THE COURT: Would you like a moment?

JUROR NO. 4: I am sorry.

THE COURT: You were crying.

JUROR NO. 4: I am so upset.

THE COURT: That is all right.

(Pause.)

JUROR NO. 4: I just feel really bad for her, that's all.

THE COURT: Well—

JUROR NO. 4: I don't know whose fault it is. I just feel real bad for her. That is all. I wish there was something I could do for her, or something, to help her.

THE COURT: All right. Do you agree with the verdict?

JUROR NO. 4: Yeah, I guess—I don't know what to say. I guess that's—I don't know. See, I am not smart about the medical or whatever, you know.

THE COURT: Well, do you agree with the verdict?

JUROR NO. 4: Yeah, I guess I have to say yes.

THE COURT: Well, you don't have to say anything.

JUROR NO. 4: But I have to vote. Right?

THE COURT: You have to vote.

JUROR NO. 4: See, I don't know. I don't know. I wasn't there. I don't know. I have to say yes from all the testimony for both of them.

THE COURT: Pardon?

JUROR NO. 4: From all, what they both said, I have to agree with what everybody else says.

THE COURT: Well, you don't have to agree with what everybody else says if you don't agree with it.

JUROR NO. 4: I know. But it's just me against everybody else. Nobody else agrees with me, so ... If I would have thought at first ...

THE COURT: Would you want to go back to the jury room?

JUROR NO. 4: No, nobody is going—I guess I have to agree with everybody else.

THE COURT: Do counsel have any questions?

MS. SHARP: I don't have any further questions.

THE COURT: I want to make sure that your verdict for the defendant is what you genuinely believe the verdict should be. Is that what you, yourself, independently, genuinely believe?

JUROR NO. 4: Okay. Yes.

THE COURT: The answer is yes?

(Juror No. 4 nods head affirmatively.)

THE COURT: You think the verdict should be for defendant?

JUROR NO. 4: I don't know. I wish it could be both ways. But it can't, so I guess I have to say yes.

MS. SHARP: Your Honor, perhaps I do have a question.

Are you saying that your vote is in favor of the plaintiff—

JUROR NO. 4: May I have a tissue?

(Tissue handed to Juror No. 4.)

JUROR NO. 4: I am sorry. See, I never had a baby, so I don't know what to say about any of that, you know?

MS. SHARP: Are you saying that your vote was for plaintiffs and that everybody else's vote was for the defense?

THE COURT: I am sorry. I cannot permit that.

MS. SHARP: I am sorry? I didn't hear you, sir.

THE COURT: I cannot permit that question.

MS. SHARP: All right. I understand.

THE COURT: That is improper, under the case law.

JUROR NO. 4: It is more in favor of the defendant, that way, how many of each question—

THE COURT: You are not permitted to tell us how each voted.

MS. SHARP: I understand.

In light, Your Honor, of the length of time that the jury was out, may I ask questions about the opportunity to discuss testimony?

THE COURT: Did you have an adequate opportunity to express your point of view?

JUROR NO. 4: Yes. But I don't know what to say, though. You know?

THE COURT: You didn't know which way. Is that what you are saying?

JUROR NO. 4: At first I thought for the plaintiff. Then from what everybody was talking about, maybe it should be the defendant. Then I felt bad for her.

THE COURT: So you feel bad for the plaintiff.

JUROR NO. 4: Sympathetic, I guess you would say.

THE COURT: But your vote definitely was for the defendant?

JUROR NO. 4: Yes.

THE COURT: The way you feel?

JUROR NO. 4: Yes, I guess so, yes.

THE COURT: Is that correct?

JUROR NO. 4: Yes. I felt bad, though.

THE COURT: I don't want any doubts about it.

JUROR NO. 4: I know. I have to say yes.

THE COURT: Is that the way you felt?

MS. SHARP: Do you have doubts?

JUROR NO. 4: See, I don't know anything about having a baby or nothing at all, pain or whatever, what she went through, what you would say and what you would say. I don't know. I don't have any children. I don't want to have any now. You know? I have to say for the defendant.

THE COURT: You say the verdict is for the defendant?

JUROR NO. 4: Yes.

THE COURT: That was your vote.

JUROR NO. 4: From what we read back at those charts.

THE COURT: Pardon?

JUROR NO. 4: From what we read back, if he got information, about what happened to her when she was a baby.

THE COURT: Again, I don't want to get into what you were deliberating about.

JUROR NO. 4: I feel better now.

THE COURT: You feel better. But I want to be sure that your vote is freely given for the defendant.

JUROR NO. 4: Yes.

THE COURT: Very well. Thank you.

D.I. 115 at 5–10. Juror 4 resumed her place in the jury box; shortly thereafter the entire jury was dismissed as a group. Based on these events, plaintiff now argues the adverse verdict was not Martone's verdict and seeks to draw an inference that Martone was improperly subject to peer pressure from her fellow jurors. Although plaintiff did not request it at the time, she now asserts it was error for the court to question Martone at sidebar, rather than in the privacy of chambers.

Martone was clearly disturbed by the subject matter and evidence in this case. It was uncontroverted that plaintiff, a young, likeable, and articulate woman, had suffered and still suffers greatly from the events stemming from the birth of her baby. It was not surprising that Martone, who was of similar age to plaintiff, was emotionally affected by what she saw and heard in court. Cognizant of these considerations, the Court undertook to determine whether Martone's verdict as polled represented her true position without inquiring into the reasoning process or motivation behind the verdict. *See United States v. Blankenship,* 707 F.2d 807, 810 (4th Cir. 1983); *Roy v. Star Chopper Co. Inc.,* 584 F.2d 1124, 1136 (1st Cir.1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979); *Grace Lines, Inc. v. Motley,* 439 F.2d 1028, 1031–1033 (2d Cir.1971); *United States v. Lockhart,* 366 F.Supp. 843, 848 (E.D.Pa.

1973) (Becker, J.), *aff'd,* 495 F.2d 1369 (3d Cir.1974).

In this situation, where there is a question about a juror's individual verdict, the preferred course of action is to first try to clarify the juror's response. *United States v. Hernandez–Garcia,* 901 F.2d 875, 879 (10th Cir.), *cert. denied,* 498 U.S. 844, 111 S.Ct. 125, 112 L.Ed.2d 94 (1990). Here, Martone was gently questioned by the Court, out of hearing of her fellow jurors,[2] and asked repeatedly whether the verdict for the defendants was her own. The Court asked Martone whether she had adequate occasion to express her own point of view during deliberations, to which she stated, "Yes." It was clear she felt sympathetic towards the plaintiff; she repeatedly stated she "felt bad" for her. The Court also gave her ample opportunity to equivocate on her stated position for the defendants; Martone stated seven times that her verdict was for the defendant, that it was freely given, without any doubts. It was clear from both her words and her demeanor that initially she was conflicted between her emotions and her desire to adhere to the law as instructed by the Court. By the end of the sidebar conference, Martone had regained her composure and was resolute in her verdict. Once she put aside her sympathy, a difficult but necessary step in arriving at her verdict, it was clear to the Court that Martone had firmly decided in favor of the defendants.

Plaintiff also submitted an affidavit of a member of her counsel's law firm, who claimed to be present at the rear of the courtroom during the sidebar discussion with Ms. Martone. D.I. 116, Exhibit A. The affiant declared that while Martone was answering questions at sidebar, unbeknownst to the Court, counsel, and Martone, a male juror in the center of the second row of the jury box conversed with nearby jurors. According to the affidavit, this juror "conveyed a sense of annoyance" with Martone, although the affiant could not discern the content of the juror's conversation. From this male juror's conduct, plaintiff seeks the infer-

**2.** The participants at the sidebar conference, which was held below the elevated bench on the side farthest away from the jury, were also obstructed in large part from the view of the jury, who remained seated in the jury box.

ence that Martone's views were not considered during deliberations and Martone had been subject to pressure and disdain of other jurors who disagreed with her.[3] D.I. 118 at 25, 26 n. 10.

The United States Court of Appeals for the Third Circuit has established guidelines for determining whether a jury's verdict may be impeached. "Any attempt to impeach a jury verdict initially encounters two evidentiary obstacles: (1) producing evidence competent to attack the verdict, and (2) establishing the existence of grounds recognized as adequate to overturn the verdict." *Government of Virgin Islands v. Nicholas,* 759 F.2d 1073, 1078 (3d Cir.1985) (quoting *Government of Virgin Islands v. Gereau,* 523 F.2d 140, 148 (3d Cir.1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976). Here, plaintiff fails to satisfy the initial requirement, *i.e.,* the production of competent evidence.

It is well settled that a jury's deliberative processes are not "legally cognizable, except where subject to extraneous influences.'" *Van Buskirk v. Carey Canadian Mines, Ltd.,* 760 F.2d 481, 488 (3d Cir.1985). Accordingly, the consistent focus under the relevant federal decisions has been upon the insulation from attack by disgruntled parties on the manner in which a jury reached its verdict, including deliberation, discussions, mental and emotional reactions, votes, and other features of the process. *See Nicholas,* 759 F.2d at 1080 n. 5 and collecting cases. The Federal Rules of Evidence similarly proscribes a juror's testifying to impeach the verdict on matters other than those that implicate extraneous prejudice or outside influence. Fed.R.Evid. 606(b).

The instant case does not concern extraneous prejudicial information or outside influence exerted on the jury or specifically on Juror 4, Ms. Martone. Plaintiff has submitted an affidavit from a court bystander who was not a part of the deliberative process and who merely saw jurors converse while the Court conducted a sidebar conference. The subject matter and actual words of the jurors' dialogue are not part of the record and were not known by the affiant. The affiant speculates as to the content of the jurors' conversation; plaintiff uses this as a foundation for her argument that Juror Martone's views were not heard and that she was possibly coerced into her verdict. The affidavit demonstrates no evidence of extraneous prejudicial information or outside influence;[4] it is therefore incompetent to impeach the jury verdict. *See Scogin v. Century Fitness, Inc.,* 780 F.2d 1316, 1320 (8th Cir.1985) (courtroom bystander's affidavit incompetent to impeach jury verdict as quotient verdict).

■■■ Further, even if the affidavit was considered as evidence of the other jurors exerting influence on Martone, the verdict for defendants would still stand as unanimous. A juror's verdict is not vitiated because one juror, "who would have preferred a different result, has determined in good conscience that he can go along with the other jurors." 11 Wright and Miller at § 2810; *see also Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1189 n. 29 (1st Cir.1980) (citing 89 C.J.S. *Trial* § 490(2) (1955) (verdict stands even if the juror hesitated to agree to it, or admitted she consented to it under protest,

---

3. Plaintiff has identified this male juror as Juror 8. D.I. 118 at 20. In her brief, plaintiff also identifies Juror 8 as being Tim Cross, the juror whom plaintiff objected to as being prejudiced because of previous ties to the medical community. The record documents Mr. Cross as Juror 7, thus, any additional objection to Mr. Cross's presence on the jury based on Juror 8's alleged exertion of "pressure and disdain" towards Juror Martone are unfounded. Correspondence file, Juror record, CA 93–327.

4. Extraneous influence has been described as 1) exposure of jurors to news items about matters pending before the jury, 2) consideration by jurors of extra record facts, 3) communications between jurors and third parties impinging on matters at issue in the case, and 4) pressures or partiality on the part of the Court. *Government of Virgin Islands v. Gereau,* 523 F.2d 140, 150 (3d Cir.1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976) (citations omitted). Nothing close to any of these paradigms has been raised in this case.

Intrinsic influences include "discussions among jurors, intimidation or harassment of one juror by another, and other intra-jury influences on the verdict." *Id.* At best, plaintiff's affiant only hints at this type evidence, which is inadmissible.

or that she agreed to it for the sake of harmony), *cert. denied,* 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981); *Sheeran v. State,* 526 A.2d 886, 896–97 (Del.1987) (it is natural during deliberations that the majority jurors exert pressure on those in the minority). Here, while Martone voiced some initial uncertainty with her verdict, she ultimately and expressly joined with her peers; there is nothing in the record to indicate that she was not doing so honestly and in good conscience. It may be that Martone was hopeful that plaintiff would recover an award, but when she was unable to persuade any other jurors to agree with her, she accepted as reasonable the finding of the other eight jurors that, given the evidence and the prevailing law, on a fair preponderance of the evidence standard, the plaintiff could not prevail. *Grace Lines Inc. v. Motley,* 439 F.2d 1028, 1032 (2d Cir.1971); *United States v. Lockhart,* 366 F.Supp. 843, 851 (E.D.Pa.1973) (Becker, J.), *aff'd,* 495 F.2d 1369 (3d Cir. 1974); *Roy v. Star Chopper Co., Inc.,* 584 F.2d 1124, 1137 (1st Cir.1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979). Where, as here, the only evidence adduced to impeach the verdict implicates intra-jury discussions and influences, speculation about the jury's conduct does not reach a level of impropriety to warrant the setting aside of the verdict.

### 3. Alleged Misconduct of Defense Counsel

█ Plaintiff next argues that defense witnesses misrepresented facts during the trial and defense counsel improperly prejudiced plaintiff during opening and closing arguments. A new trial may be granted when prejudicial remarks by counsel during trial have made it "reasonably probable that the verdict was influenced by prejudicial statements." *Fineman v. Armstrong World Industries, Inc.,* 980 F.2d 171, 207 (3d Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993). The trial court has considerable discretion when evaluating whether conduct by counsel is so prejudicial so as to warrant a new trial, *id.,* and may consider a combination of improprieties by counsel as prejudicially impacting the jury. *Draper v. Airco, Inc.,* 580 F.2d 91, 94–95 (3d

Cir.1978); *Falkowski v. Johnson,* 148 F.R.D. 132, 135 (D.Del.1993).

█ Plaintiff's mainstay argument is that there were many instances of prejudicial conduct on the part of defense counsel that warrants a new trial. For example, plaintiff criticizes as unsubstantiated defense counsel's opening statement that Mrs. Bolt's childhood cancer was treated with radium needles that were inserted "approximately one inch deep." However, expert defense testimony later demonstrated that the radiation implants used during Bolt's infancy were about an inch in length and inserted into her vulva to the level of the pubic bone. D.I. 110 at 707–09. Even plaintiff's own expert testified that the radium needles "went deep into the tissue." D.I. 107 at 115. Thus, the trial record shows defense counsel's opening remark was neither improper nor unsupported by the evidence.

Plaintiff assails other aspects of her opponent's opening statement. She criticizes the defense's reference to any pre-existing condition plaintiff may have had because of her childhood cancer, and asserts there was no pre-existing condition. The record, however, is replete with testimony of plaintiff's prior physical problem, *i.e.,* her cancer; indeed the entire case revolved around the issue of how best to deliver plaintiff's baby in the face of this prior medical condition and its consequences. At the close of the evidence, the jury was specifically instructed how it was expected to consider plaintiff's pre-existing condition under the law. D.I. 113 at 763.

Other attacks on defendants' opening remarks, once examined, fall similarly by the wayside. Plaintiff contends that defendants should not have told the jury that a) plaintiff's episiotomy infection only affected local, superficial tissue, b) Dr. Hickok consciously decided how to perform plaintiff's episiotomy in light of her history of vulvar cancer, c) Dr. Hickok consciously decided that a vaginal delivery, as opposed to Caesarean section, was safest for plaintiff, and d) Mrs. Bolt did not complain of incontinence until the Thanksgiving following her delivery. As to all of these assertions of misleading opening remarks by defense, the evidentiary record

720

clearly reflects their propriety. *See, e.g.,* D.I. 110 at 593–94(a); D.I. 109 at 499(b); D.I. 109 at 463(c); D.I. 109 at 342(d).

■ Next, plaintiff portrays as "particularly egregious and prejudicial" defense counsel's remarks during summation relating to evidence, or lack thereof, of damage to Mrs. Bolt's baby. Defense counsel had inaccurately argued that "[t]here's not evidence of any injury to this baby. And that would be unfair to Dr. Hickok if you're thinking that he caused an injury to this baby because it's not true here. There's no evidence in this trial." D.I. 113 at 796. During the trial, Mrs. Bolt had testified that her newborn baby had suffered some bruising and laceration as a result of delivery. Because damages to the baby were not at issue in this case, and thus not relevant, none of the baby's hospital records were admitted into evidence. Defense counsel raised this absence of documentary evidence in closing arguments as an indication that Mrs. Bolt's recollection was somehow faulty, calling into question her credibility. Plaintiff objected to her opponent's closing argument, interrupting the summation by requesting a sidebar conference. D.I. 113 at 796.

Although the status of the baby's health after delivery was irrelevant to the issues at trial, because plaintiff's credibility had been called into question, the Court pointed out to plaintiff's counsel that she could direct the jury to medical documentation precisely corroborating Mrs. Bolt's testimony. The Court also shared the thought that plaintiff's counsel could "[j]ust say [defense counsel] was plain wrong. Do it however way you want to put it." *Id.* at 841. When asked whether highlighting defense counsel's misstatement and substantiating plaintiff's testimony in rebuttal would solve the problem, plaintiff's counsel answered affirmatively. Satisfied with this solution to her objection, plaintiff's counsel showed the jury exactly where Mrs. Bolt's hospital records documented that the baby had sustained bruises. D.I. 113 at 843.

At trial, both plaintiff's counsel and the Court were satisfied that the measures undertaken to cure defense counsel's misstatements resolved any credibility issue with respect to Mrs. Bolt's testimony about harm to her baby. Plaintiff's counsel enjoyed wide latitude in strengthening her client's credibility while simultaneously diminishing the credibility of her adversary by exposing the defense's misstatement. With plaintiff's vigorous rebuttal, it is unlikely her opponent's misstatement had any lasting prejudicial effect on the jury.

Plaintiff also characterizes as "even more egregious" the use by the defense experts of a penny as a unit of reference on a medical diagram of the pelvic anatomy of a 13 month old female. Although plaintiff insists the use of such a familiar object was calculated to inflame and prejudice the jury, she never explains this argument and did not object to the use of this illustrative tool when it was introduced. Defense experts Gorondy and Larson explained that the penny was intended to provide the jury with an everyday frame of reference for evaluating distances between anatomical structures on the medical diagram. D.I. 110 at 622, 706. These experts, both physicians, explained in a professional, clinical manner that the penny's role was merely to facilitate the jury's understanding of the medical evidence. There was no evidence that the penny was intended to inflame or prejudice the jury, nor was there any reason to infer the jury was adversely impacted.

■ Plaintiff alleges other prejudicial conduct by defense counsel. Prior to trial, counsel for both parties had privately agreed to truncate their list of witnesses for the sake of trial expediency; each had eliminated two witnesses from her respective case-in-chief. D.I. 113 at 815–16. Counsel had further apparently agreed that each would not comment to the jury or invite any negative inference stemming from these witnesses' absence. *Id.* During closing argument defense counsel emphasized the absence of a physician, a Dr. Cuccia, who had treated plaintiff's cancer during her infancy. Although this particular witness was not the subject of counsels' informal pact of silence, *id.* at 816, plaintiff's counsel interrupted her opponent's closing argument at this juncture.

At sidebar, plaintiff objected, arguing that the mentioning of any absent witness contra-

vened the spirit of counsels' agreement, and that the witness was equally available to both parties. The Court agreed and immediately explained to the jury that although Dr. Cuccia could have been called by either party, any commentary by defense counsel on Cuccia's absence might be misleading[5]. This action more than sufficiently eliminated any remnant of possible prejudice to the plaintiff. It was clear from the Court's demeanor and curative instruction that defense counsel had acted improperly; thus, if any net prejudice resulted from the incident, it inured to defendants' detriment.

Plaintiff also points to her opponent's summation where defense counsel characterized plaintiff's experts as testifying that a Caesarean section delivery was medically indicated because plaintiff's uterus had not received any radiation from her vaginal implants. D.I. 113 at 804. One sentence later, defense counsel portrayed plaintiff's experts as positing, "[t]he cesarean [sic] section was safe because there's no radiation *damage* to that uterus," and then she added, "I think that's what the argument is." *Id.* (emphasis added).

Plaintiff argues that defense counsel mischaracterized the experts' testimony, and that the experts *did* testify that the uterus sustained some radiation, albeit in such small amount so as to not jeopardize a safe Caesarean delivery. Defendants argue, and the Court agrees, that plaintiff's argument unduly focuses on semantics. Plaintiff's experts and defense experts were diametrically opposed on the pivotal issues in this case, and defense counsel's closing remarks simply underscored the essential conflict between the parties.

Finally, plaintiff's argument about witnesses mischaracterizing facts does not merit discussion. The mere fact that defense witnesses recounted the facts differently than those testifying for plaintiff does not implicate any witness misconduct. If the litigants'

versions of the case were in harmony, there would have been no need for this trial.

## 4. Verdict Against the Great Weight of the Evidence

Plaintiff's final argument asserts that the verdict for defendants is against the great weight of the evidence. Under the case law, a trial court has wide discretion when faced with a motion for a new trial, however, this discretion is not unlimited. A new trial grounded on the reason that a verdict is against the great weight of the evidence should be granted only "where a miscarriage of justice would result if the verdict were left to stand," *Klein v. Hollings,* 992 F.2d 1285 (3d Cir.1993), or where the verdict "cries out to be overturned or shocks" the conscience of the court. *Williamson v. Conrail,* 926 F.2d 1344, 1353 (3d Cir.1988). Thus, the Court may not substitute its own judgment for that of the jury's merely because the Court might have come to a different conclusion.

This medical malpractice trial presented a classic confrontation between plaintiff's and defendants' expert testimony. As plaintiff succinctly stated in her brief,

> Plaintiff's experts clearly opined that, in terms of reasonable medical probability, the dose of radiation received by the vaginal tissue was greater than that received by the abdominal tissue which would be cut in a cesarian [sic] section. Accordingly, plaintiff's experts opined unequivocally that the standard of care required cesarian [sic] section.

D.I. 118 at 31.

Defendants are correct when they counter that Dr. Hickok and his experts fundamentally disagreed with plaintiff's position. The defendants' experts also testified to the requisite degree of medical probability, but instead condoned Hickok's decision to deliver plaintiff's baby vaginally. In so doing, defen-

---

5. The entire curative instruction given to the jury is as follows:

> "Mention has been made by defense counsel in her closing about the absence of Dr. Cuccia. That's what led to this sidebar which we just had. I want to advise you that Dr. Cuccia was equally available to the plaintiff and the defendant. So that if either wanted him here, they could have had him here, presumably. But the important principle is he was equally available to both. So to comment that he wasn't there might be misleading to you."
> D.I. 113 at 817–18.

dants presented credible evidence supporting the jury's verdict that Hickok's actions did not violate the proper medical standard of care. The jury's acceptance of defendants' evidence has strong roots in the record; an extended exegesis at this point would have little utility.

After carefully revisiting the trial evidence, the Court does not view the jury's verdict as resulting in a miscarriage of justice or inconsistent with the great weight of the evidence. There is thus no reason to usurp the prime function of the jury and defenestrate the verdict.

## IV. CONCLUSION

For the above stated reasons, the Court will deny plaintiff's motion for a new trial, holding that 1) no juror was prejudiced against plaintiff such that he or she could not reach a fair and impartial verdict, 2) the unanimous jury verdict represented the individual verdict of each juror, 3) defense counsel did not unfairly prejudice the jury, and 4) the verdict was not inconsistent with the great weight of the evidence. An appropriate order will issue.