**UNITED STATES of America,**

v.

**Paul J. MANGIARDI, Defendant.**

**Nos. 4:CR–95–0233, 4:CV–00–2024.**

United States District Court, M.D. Pennsylvania.

Nov. 27, 2001.

George J. Rocktashel, Asst. U.S. Atty., Williamsport, PA, for U.S.

Paul Mangiardi, Fort Dix, NJ, pro se.

### MEMORANDUM

McCLURE, District Judge.

Before the court is Paul J. Mangiardi's motion under 28 U.S.C. § 2255 to vacate, set aside or correct his sentence. After a four-week jury trial, Mangiardi was convicted of 15 counts of mail fraud and one count of conspiracy. In his § 2255 motion, Mangiardi complains of court error, prosecutorial misconduct, and ineffective assistance of counsel. We will hold an evidentiary hearing relating to Mangiardi's failure to testify at trial. Otherwise, we find that each of Mangiardi's claims lacks merit, and will deny the motion.

### BACKGROUND:

Mangiardi's conviction grew out of a scheme to market health benefit plans through several companies that he created, controlled, and operated. While the plans were represented to be fully-funded, self-insured trusts with backup coverage for claims exceeding premium contributions, Mangiardi failed to secure either reinsurance or stop-loss coverage, and he did not have the funds to compensate. Eventually, policy beneficiaries were left with unpaid claims.

Between April 22, 1987, and March 21, 1988, Mangiardi defrauded two elderly women, Ruth Waltman and Reba Fleming, of a total of $371,632.00. He used the proceeds to establish PARCare, a company purported to be engaged in the business of third-party administration of single-employer health plans under the Employee Retirement Income Security Act (ERISA). He issued the women certificates of investment in PARCare.

The purpose of operating PARCare under ERISA was to avoid regulation by the Pennsylvania Insurance Department. But PARCare failed to comply with ERISA for various reasons, including the failure to establish trusts and trust accounts for each employer and the commingling of funds. The commingling of funds caused the operation to be in the business of insurance, for which neither Mangiardi nor his business was licensed. Also, the business had insufficient capital to operate as an insurance company.

The Insurance Department issued a suspension order for PARCare and eventually assumed control of the company. Mangiardi sent his son to Delaware to open a business called 1st Health, and then diverted to 1st Health funds intended for PARCare. Mangiardi entered into a consent decree with the Insurance Department and was permitted to operate a company called West Branch Administrators. Eventually, however, West Branch Administrators went the way of PARCare, for essentially the same reasons.

Mangiardi's operations resulted in large-scale fraud. The plans were generally marketed to small businesses in need of inexpensive health care coverage for employees. In all, more than 5,000 of these employees were covered by the plans dur-

ing the operation of PARCare, 1st Health, and West Branch Administrators.

After a grand jury returned a 16–count superseding indictment against him, Mangiardi was tried by a jury. The trial relevant to the instant motion was the second of two trials, which occurred after the first one was declared a mistrial. Being tried in the second trial as Mangiardi's codefendant was his son Eric Mangiardi, who was charged as a coconspirator. The jury returned a verdict of guilty against Paul Mangiardi as to all counts of the superseding indictment. The jury was deadlocked with respect to Eric Mangiardi, and the conspiracy charge against him was eventually dismissed. Paul Mangiardi was sentenced to a term of incarceration of 60 months on Count 1 and 151 months on each of Counts 2 through 16, to be served concurrently with each other and with Count 1. The total sentence was a period of incarceration of 151 months to be followed by a 3–year period of supervised release.

The Third Circuit affirmed the judgment of conviction and sentence. 202 F.3d 255 (3d Cir.2000). The only issue on direct appeal was whether the district court erred in admitting the evidence relating to Mangiardi's dealings with Waltman and Fleming. Mangiardi argued that the evidence's probative value was substantially outweighed by the danger of unfair prejudice, but the Court of Appeals held that the evidence was admissible. The Supreme Court denied Mangiardi's petition for a writ of certiorari, 529 U.S. 1060, 120 S.Ct. 1569, 146 L.Ed.2d 472 (2000).

## DISCUSSION:

A liberal construction of Mangiardi's motion demonstrates that he brings claims of court error, prosecutorial misconduct, and ineffective assistance of counsel. While Mangiardi does not adequately separate these claims, they are indeed distinct, and for clarity's sake we will divide our analysis between claims involving the proceedings alone (and not counsel's effectiveness) and claims relating solely to ineffective assistance of counsel.

Mangiardi brings the following claims relating solely to the proceedings:

• The court denied Mangiardi his full use of peremptory challenges, causing the jury to be biased;

• the prosecution committed misconduct by (1) comparing Mangiardi and his companies to a shark, (2) falsely stating that Mangiardi manipulated and coerced Waltman and Fleming into giving him their money, (3) presenting perjured testimony, and (4) improperly objecting to the testimony of one of Mangiardi's attorneys;

• the evidence was insufficient to convict Mangiardi of conspiracy;

• the court coerced the verdict by allowing an ailing juror to deliberate while instructing the jurors that they were free to reach a partial verdict;

• the indictment was barred by the statute of limitations; and

• the issue of Mangiardi's scheme's effect on a financial institution should have been decided beyond a reasonable doubt, in light of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

Mangiardi brings the following claims for ineffective assistance of counsel:

• trial counsel failed to challenge certain jurors for cause;

• trial counsel failed to object to the "shark" reference in the prosecution's opening statement;

• trial counsel failed to object to the government's reference to Waltman and Fleming;

- trial counsel failed to object to the prosecution's perjured testimony;

- trial counsel failed to argue that the statute of limitations barred the indictment;

- trial counsel failed to challenge the coerced verdict;

- trial counsel failed to call certain witnesses;

- trial counsel failed to qualify certain testifying witnesses as experts;

- trial counsel refused to let Mangiardi testify despite Mangiardi's wishes to do so; and

- appellate counsel failed to raise on appeal every issue in the instant motion.

Section 2255 allows prisoners in federal custody to attack the validity of their sentences. In general, relief under § 2255 is limited to the curing of errors that were jurisdictional, rose to the level of a constitutional violation, resulted in a "complete miscarriage of justice," or led to proceedings that were "inconsistent with the rudimentary demands of fair procedure." *United States v. Timmreck,* 441 U.S. 780, 783–84, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979) (citations omitted); *see also United States v. Addonizio,* 442 U.S. 178, 185–86, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979) (citations omitted); *United States v. Essig,* 10 F.3d 968, 977 n. 25 (3d Cir.1993) (citations omitted).

"Generally, if a prisoner's § 2255 [motion] raises an issue of material fact, the district court must hold a hearing to determine the truth of the allegations." *Essig,* 10 F.3d at 976 (citations omitted). "A district court need not hold a hearing if the motion and files and records of the case show conclusively that the movant is not entitled to relief." *United States v. Melendez,* No. CRIM. 00–00069–01, CIV. 01–3305, 2001 WL 1251462, at *2 (E.D.Pa.

September 21, 2001) (slip copy) (citing *Government of the Virgin Islands v. Forte,* 865 F.2d 59, 62 (3d Cir.1989)).

Before addressing the substance of Mangiardi's claims, we first must consider the issue of procedural default. As noted above, Mangiardi's direct appeal was limited to the admissibility of the evidence relating to Waltman and Fleming. The remaining claims challenging the court proceedings arguably are procedurally barred because Mangiardi could have raised them on direct appeal, but did not. *See United States v. Frady,* 456 U.S. 152, 167, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). The government, though, does not argue that any of Mangiardi's claims are for this reason procedurally barred, and the court "is not required to raise the issue of procedural default sua sponte." *Langston v. United States,* 105 F.Supp.2d 419, 422 (E.D.Pa.2000) (adjudicating the merits of a defendant's § 2255 claim that he was incompetent to stand trial, notwithstanding that the defendant did not raise the claim at trial or on direct appeal) (citing *Smith v. Horn,* 120 F.3d 400, 407–409 (3d Cir. 1997)). Because each of Mangiardi's claims relating to the proceedings lacks merit, the result would be the same whether or not the claims are barred. Mangiardi is of course permitted in a § 2255 motion to raise for the first time his claims for ineffective assistance of counsel. *United States v. Garth,* 188 F.3d 99, 107 n. 11 (3d Cir.1999) (citing *United States v. DeRewal,* 10 F.3d 100, 103 (3d Cir.1993)). We now are free to examine the merits of Mangiardi's motion.

## CLAIMS OF ERROR IN THE PROCEEDINGS

### 1. *Jury Selection*

Through a variety of avenues, Mangiardi argues that he was denied his Sixth

Amendment right to be tried by an impartial jury and his right to due process of law under the Fifth Amendment. A generous reading of Mangiardi's motion indicates that he seeks relief for either or both of the following reasons: (1) the court's erroneous cause determinations forced him to use his peremptory challenges to excuse the unfit jurors, thereby denying his right to those peremptory challenges in violation of the Sixth Amendment, Federal Rule of Criminal Procedure 24(b), and the Fifth Amendment Due Process Clause; and (2) the jury that ultimately convicted him was biased, in violation of the Sixth Amendment.

■ Although Mangiardi's two arguments are related, claims such as the one based solely on the denial of peremptory challenges are generally without merit because (1) the proper focus is on the ultimate makeup of the jury rather than the use of peremptory challenges; and (2) even when the trial court makes an erroneous voir dire decision, the defendant has a choice between using his peremptory challenges or seating the biased juror and, if convicted, taking his or her chances on appeal; this option is all that the law warrants. *See United States v. Martinez–Salazar,* 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000); *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). To be sure, "the seating of any juror who should have been dismissed for cause ... would require reversal." *Martinez–Salazar,* 528 U.S. at 316, 120 S.Ct. 774 (citing *Ross,* 487 U.S. at 85, 108 S.Ct. 2273). But the Supreme Court held in *Martinez–Salazar* that when a trial court erroneously fails to excuse a juror who should have been excused for cause, and the defendant subsequently uses a peremptory challenge to correct the judge's error and excuse that juror, the defendant "has not been deprived of any rule-based or constitutional right" if he or she is "subsequently convicted by a jury on which no biased juror sat." *Id.* at 307, 120 S.Ct. 774.

*Martinez–Salazar* addressed two concerns: the "constitutional right," which refers primarily to the Sixth Amendment right to an impartial jury, and the "rule-based right," which refers to Federal Rule of Criminal Procedure 24(b)'s grant of ten peremptory challenges to a criminal defendant on trial for a felony not punishable by death. *Id.* at 311, 120 S.Ct. 774. The right to peremptory challenges under Rule 24(b) may at times be framed in terms of another constitutional right: the Fifth Amendment right to due process of law. *Id.* at 317, 120 S.Ct. 774.

*Martinez–Salazar* reaffirmed *Ross's* holding that a court must focus on the impartiality of the seated jury, and not the use of peremptory challenges, when considering whether a defendant's Sixth Amendment rights have been violated. It held that the loss of a peremptory challenge, without more, does not constitute a violation of the Sixth Amendment right to an impartial jury. *Id.* at 313, 120 S.Ct. 774 (citing *Ross,* 487 U.S. at 88, 108 S.Ct. 2273). In other words, "'so long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.'" *Id.* (quoting *Ross,* 487 U.S. at 88, 108 S.Ct. 2273). The rationale here is that "[peremptory] challenges are auxiliary; unlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension." *Id.* at 311, 120 S.Ct. 774 (citing *Ross,* 487 U.S. at 88, 108 S.Ct. 2273; *Stilson v. United States,* 250 U.S. 583, 586, 40 S.Ct. 28, 63 L.Ed. 1154 (1919)).

*Martinez–Salazar* also considered whether Rule 24(b) is violated when a de-

fendant exercises a peremptory challenge to excuse a juror who should have been excused for cause. It held that there is no violation in this situation. The Court pointed out that when a trial judge fails to excuse a juror for cause, the defendant has the choice between using a peremptory challenge to remove the juror and allowing the juror to sit on the jury and, if convicted, pursuing a Sixth Amendment challenge on appeal. Stating that "[a] hard choice is not the same is no choice," the Court rationalized that in this situation, the defendant still possesses the requisite number of peremptory challenges under Rule 24(b). *Id.* at 315, 120 S.Ct. 774. It concluded that the opportunity to exercise these challenges "is all [the defendant] is entitled to under the Rule." *Id.* The holding is summarized in one sentence of the opinion: "[A] defendant's exercise of peremptory challenges pursuant to Rule 24(b) is not denied or impaired when the defendant *chooses* to use a peremptory challenge to remove a juror who should have been excused for cause." *Id.* at 317, 120 S.Ct. 774 (emphasis added). At the end of the opinion, the Court held that in this situation, not only is there no violation of Rule 24(b), but there also is no Fifth Amendment due process violation, as the defendant receives precisely what Rule 24(b) provides. *Id.*

■■■ Mangiardi contends that his constitutional and statutory rights were violated because the court's failure to exclude certain jurors for cause compelled him to use his peremptory challenges to excuse those jurors, which in effect denied his right to those peremptory challenges in violation of the Sixth Amendment, Rule 24(b), and the Fifth Amendment Due Process Clause. Even assuming that the court erroneously failed to excuse certain jurors for cause, Mangiardi's argument fails. There was no Sixth Amendment violation because the loss of peremptory challenges is not considered when analyzing a Sixth Amendment claim such as this one; the only relevant consideration is the makeup of the seated jury. *See also United States v. Greig,* 133 F.Supp.2d 697, 699 (D.Vi.2001) ("The proper test to be applied ... is not whether the defendant lost a chance at a peremptory challenge, but whether the defendant was tried by an impartial jury.") (citations omitted). Also, there was neither a violation of Rule 24(b) nor a due process infraction. Mangiardi was given 13 peremptory challenges (ten for regular jurors and three for alternates) and chose to use them to cure the court's allegedly erroneous voir dire rulings. He had a choice between allowing the allegedly biased jurors to sit on the jury and exercising his peremptory challenges to strike them. He was not compelled to use a peremptory challenge, and the court denied him nothing, as he still received 13 peremptory challenges, which is all he is entitled to under Rule 24(b).

To be sure, *Martinez–Salazar* implied that at least with respect to Rule 24(b) and due process, its holding may not apply when the trial court deliberately misapplies the law in order to force a defendant to use a peremptory challenge to correct the court's error. *Martinez–Salazar,* 528 U.S. at 316, 120 S.Ct. 774. Mangiardi, however, does not allege a purposeful denial of his rights; he argues merely that he was forced to exhaust his peremptory challenges on jurors that should properly have been excused for cause. Thus, *Martinez–Salazar* defeats his claim.

That leaves us with the analysis of the impartiality of the jury, which is undoubtedly relevant to whether Mangiardi asserts a successful Sixth Amendment claim. Mangiardi contends that three of the sitting jurors, Delores Kitchen, Daniel Karpinskie, and Randy Fought, were biased

and unfit to serve. He points out that much of his trial defense was to undermine the credibility of the Pennsylvania's Department of Insurance, and argues that because Karpinskie at the time of trial worked for the Commonwealth of Pennsylvania and Kitchen was a retired postal worker, each was biased in favor of the government, which was of course prosecuting him. Next, he emphasizes that he was on trial for fraudulently withholding health benefits, and argues that because Fought suffered from a heart condition at the time of trial, he was more likely to identify with the victims of insurance fraud and thus vote to convict Mangiardi.

" 'In determining whether a particular juror should be excused for cause, [the] main concern is whether the juror holds a particular belief or opinion that will prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *United States v. Murray*, 103 F.3d 310, 323 (3d Cir.1997) (quoting *Kirk v. Raymark Industries, Inc.*, 61 F.3d 147, 153 (3d Cir.1995)). "A juror is impartial if he or she can lay aside any previously formed impression or opinion as to the merits of the case and can render a verdict based on the evidence presented in court." *Kirk*, 61 F.3d at 152 (citations and internal quotation marks omitted). " 'Determining whether a prospective juror can render a fair verdict lies peculiarly within a trial judge's province.' " *Id.* (quoting *United States v. Polan*, 970 F.2d 1280, 1284 (3d Cir.1992)).

"To disqualify a juror for cause requires a showing of either *actual* bias or *implied* bias—'that is ... bias in fact or bias conclusively presumed as a matter of law.' " *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir.2000) (quoting 47 Am.Jur.2d Jury § 266 (1995)).

Actual bias may be established by either (1) the express admission of a juror of a state of mind prejudicial to a party's interest; or (2) circumstantial evidence arising from the juror's *voir dire* answers. *United States v. Powell*, 226 F.3d 1181, 1188 (10th Cir.2000) (citing *United States v. Cerrato–Reyes*, 176 F.3d 1253, 1260; *United States v. Torres*, 128 F.3d 38, 43 (2d Cir.1997)). "[A] finding of actual bias 'is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.' " *Powell*, 226 F.3d at 1188 (citing *Wainwright v. Witt*, 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)). Jurors are presumed to answer voir dire questions truthfully. *United States v. Copple*, 24 F.3d 535, 544 n. 14 (3d Cir.1994) (citation omitted); *see also Bolt v. Hickok*, 887 F.Supp. 709, 714 (D.Del.1995). In a § 2255 motion—as at trial—the defendant bears the burden to prove actual bias. *United States v. Riddick*, 15 F.Supp.2d 673, 681 (E.D.Pa.1998) (citing *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)).

"Findings of implied bias are legal determinations dependent on an objective evaluation of the challenged juror's experiences and their relation to the case being tried." *Powell*, 226 F.3d at 1188 (citations and internal quotation marks omitted); *see also United States v. Calabrese*, 942 F.2d 218, 226 (3d Cir.1991) (recognizing that implied bias is appropriate in certain situations) (citations omitted). "[A] finding of implied bias is appropriate where the juror, although she believes that she can be impartial, is so closely connected to the circumstances at issue in the trial that bias is presumed." *Powell*, 226 F.3d at 1188 (citation and internal quotation marks omitted).

"[T]he implied bias doctrine is not to be lightly invoked, but must be reserved

for those extreme and exceptional circumstances that leave serious question whether the trial court subjected the defendant to manifestly unjust procedures resulting in a miscarriage of justice." *Id.* (citation and internal quotation marks omitted). In her concurrence in *Smith v. Phillips,* Justice O'Connor stated that implied bias may be justified in "some extreme situations," and gave some guidance as to when a court may use the doctrine:

> Some examples might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction.

*Id.* at 222, 102 S.Ct. 940 (O'Connor, J. concurring). When a juror "has not been accused of misconduct, or has no actual stake in the outcome of the trial," the court may assume that the juror "has no significant incentive to shield [his or her] biases." *United States v. Ferri,* 778 F.2d 985, 993 (3d Cir.1985) (citing *Phillips,* 455 U.S. at 223, 102 S.Ct. 940 (O'Connor, J., concurring)). " 'In such a situation, [i]t is fair to assume that the method [*voir dire*] that we have relied on since the beginning usually identifies bias.' " *Id.* (quoting *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)).

Mangiardi has not sustained his burden to demonstrate actual bias. In fact, his motion gives no indication of any argument related to actual bias. Mangiardi does not emphasize any part of the record that would demonstrate that any of the three jurors admitted a prejudicial state of mind or gave questionable voir dire answers. We have independently examined the record and have not found anything that indicates that Kitchen, Karpinskie, or Fought made an express admission of bias or showed that their presumptively truthful promises of impartiality should not have been believed.

Mangiardi does not provide a sufficient reason to invoke the doctrine of implied bias. Neither government employment nor having an illness unrelated to the case is analogous to the examples of "extreme situations" listed by O'Connor in *Phillips,* and other case law dictates that implied bias is inappropriate.

▮ Karpinskie and Kitchen were properly on the jury notwithstanding their government employment. At least two circuits have held that "a trial court 'is not required to excuse any juror on the basis of his occupational background so long as the court is able to conclude that the juror would be able to view the evidence with impartiality and to decide the case without bias.' " *United States v. Nururdin,* 8 F.3d 1187, 1191 (7th Cir.1993) (quoting *United States v. Maldonado–Rivera,* 922 F.2d 934, 970–71 (2d Cir.1990)). As stated above, the court concluded that Karpinskie and Kitchen would serve as unbiased jurors; thus, they were properly allowed to sit.

The decision whether to imply bias as to Fought, the juror with the heart condition, may be guided by *Gonzales v. Thomas,* 99 F.3d 978 (10th Cir.1996). In *Gonzales,* the Tenth Circuit was asked to decide whether a woman who herself had been a victim of rape was impliedly biased and unfit to serve as a juror in a rape trial. The court resolved two issues. First, it held that a former rape victim is not as a matter of law incapable of being impartial in the trial of an accused rapist. *Id.* at 989. The panel indicated that in determining the issue of implied bias where a juror underwent a similar experience to that of a crime victim, a court must look to "how the experience affected the juror and what similarities exist between the juror's experience and the case at trial." *Id.* at 990.

Second, the court refused to presume bias as to the juror in question because her rape occurred 25 years before the instant trial, was not reported, and did not cause her any particular trauma—as opposed to the victim's rape, which was devastating to the victim. *Id.* The requisite similarity simply was not present. *Id.* at 991.

■ The connection between Fought's condition and the experiences of the victims of Mangiardi's crimes is more attenuated than the one highlighted in *Gonzales.* Mangiardi argues that the court should presume that Fought was biased simply because Fought was sick and Mangiardi defrauded sick people. Mangiardi's victims suffered in ways completely distinguishable from their medical problems; their trust was violated and they were cheated out of large amounts of money. Because there is no indication that Fought's illness was sufficiently analogous to the victims' plights, we will not presume that Fought was biased.

No one among Karkinskie, Kitchen, and Fought had an actual stake in the outcome of Mangiardi's trial. Consistent with *Ferri* and each of the other above-cited cases, we refuse to imply bias as to any of the three jurors.

■ Two final considerations remain with respect to Mangiardi's claim of a biased jury. First, Mangiardi seems to argue that the court erred in not allowing the individual attorneys to probe the jurors for bias. This argument is rejected, as the record demonstrates otherwise. Second, Mangiardi suggests that the court should have excused Fought for undue hardship because of his heart ailment. The court was well within its discretion to keep the juror. *See* 28 U.S.C. § 1866(c)(1); *see also* 33 Fed. Proc., L.Ed. § 77:196 (1995) ("[T]he excusal of jurors based on undue hardship is discretionary.") (citing *United States v. Layton,* 632

F.Supp. 176, 178 (N.D.Ca.1986)). Further, there is no indication that Fought's condition adversely affected his ability to serve as a juror.

Mangiardi's jury was not biased, and his Sixth Amendment rights were preserved.

### 2. *Prosecutorial Misconduct*

Mangiardi raises four claims of prosecutorial misconduct: (1) the prosecutor in his opening statement impermissibly compared Mangiardi to a shark; (2) the prosecutor falsely stated that Mangiardi manipulated and coerced Waltman and Fleming into giving him their money; (3) the prosecutor presented perjured testimony; and (4) the prosecutor improperly objected to the testimony of Don Bailey, one of Mangiardi's attorneys.

■ Under § 2255, relief for prosecutorial misconduct is appropriate "when the prosecutor's misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *United States v. Walker,* Nos. 94–488, 99–584, 2000 WL 378532, at *10 (E.D.Pa. April 4, 2000) (quoting *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)). "[F]or due process to have been offended, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Werts v. Vaughn,* 228 F.3d 178, 197–98 (3d Cir. 2000) (quoting *Greer v. Miller,* 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987)) (internal quotation marks and other citations omitted).

■ The law relating specifically to a prosecutor's statements at trial is essentially identical. A conviction will be set aside if "'the prosecutor's remarks, taken in the context of the trial as a whole, were sufficiently prejudicial to have deprived

the defendant of his right to a fair trial.' " *United States v. Zinner,* Nos. 95–48–01, 96–3959, 1996 WL 628585, at *7 (E.D.Pa. October 25, 1996) (quoting *United States v. Retos,* 25 F.3d 1220, 1224 (3d Cir.1994)). " [I]f an opening statement is an objective summary of evidence the government reasonably expects to produce, a subsequent failure in proof will not necessarily result in a mistrial.' " *Retos,* 25 F.3d at 1226 (quoting *United States v. Wright–Barker,* 784 F.2d 161, 175 (3d Cir.1986)). A prosecutor does not commit misconduct when his closing argument is "a 'fair comment on the evidence adduced at trial.' " *United States v. Reilly,* 33 F.3d 1396, 1421 (3d Cir.1994) (quoting *United States v. Pungitore,* 910 F.2d 1084, 1127 (3d Cir.1990)); *see also Werts,* 228 F.3d at 205. "Even if a prosecutor does make an offending statement, the district court can neutralize any prejudicial effect by carefully instructing the jury 'to treat the arguments of counsel as devoid of evidentiary conduct' " *Retos,* 25 F.3d at 1224 (quoting *United States v. Somers,* 496 F.2d 723, 738 (3d Cir.1974)) (other citation omitted).

In any event, "a reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton,* 255 F.3d 95, 107 (3d Cir.2001).

### A. *Reference to a shark*

Mangiardi argues that the government committed prosecutorial misconduct during its opening statement by comparing Mangiardi and his insurance operation to a shark. Mangiardi challenges the following portion of the opening statement:

> One way to think of this scheme is to keep in mind that its success, the ongoing nature of the scheme is kind of like a shark, it has to keep on moving or it will die. As you may know from watching some of these underwater shows that are prolific on television, especially cable television, sharks have to keep moving, and if a shark doesn't move, it doesn't breathe, because the water doesn't pass across the gills and provide the oxygen it needs to survive.
>
> Well, the oxygen for the Mangiardi companies were premium contributions, and the more premium contributions that came in, the more successful the scheme and artifice to defraud.
>
> . . .
>
> . . . In addition, you'll hear from insurance agents that were utilized by Paul and Eric Mangiardi to market this plan, to keep the shark moving, to make sure that the premiums and the new customers keep coming in so that base keeps building up so that the claims, the smaller claims can continue to be paid.

(Trial Transcript, May 12, 1998, Rec. Doc. No. 520, at 31, 35.)

█ The government's reference to a shark, while certainly questionable, was not so egregious as to warrant relief. The government did not compare Mangiardi to a shark, but only analogized the operation of Mangiardi's scheme to the breathing patterns of a shark. *Cf. United States v. Strissel,* 920 F.2d 1162, 1167 (4th Cir.1990) (finding that the government's reference to Al Capone in a RICO trial was not prejudicial where the reference to Capone was not for the purpose of comparing the defendant to Capone, but to emphasize that RICO applies to people other than gangsters). Several times the court instructed the jury that the statements of counsel were not to be considered as evidence. The actual evidence against Mangiardi was substantial, a fact which reduced the likelihood that the jury's verdict was influenced by the reference to a shark. *See Darden,*

477 U.S. at 182, 106 S.Ct. 2464; *Moore*, 255 F.3d at 106. We find that the government's reference to a shark was not improper.

B. *Reference to Waltman and Fleming*

Next, Mangiardi contends that he was prejudiced by references in the government's opening statement and closing argument to Mangiardi's deception of Waltman and Fleming in the course of building PARCare. Mangiardi seems to make three arguments: (1) the government falsely stated that he used the women's money to start PARCare, when in reality PARCare was in existence before Mangiardi received the money; (2) the government falsely stated that Mangiardi manipulated and coerced the women into giving him their money; and (3) the government's statements relating to Mangiardi's dealings with Waltman and Fleming were prejudicial because they characterized him as defrauding elderly women. While Mangiardi does not state specifically which portions of the government's statements he is challenging, we will analyze those portions that would most strongly support his claim. In its opening statement, the government made the following reference to Waltman and Fleming:

> What are the Mangiardi companies? Like I said, they are identified in the indictment. The first one, PARCare, was founded by Paul Mangiardi sometime in the vicinity of 1987, working into 1988.1988 is the beginning of the conspiracy identified in the indictment.

> Throughout that period leading into the early part of 1988 Paul Mangiardi obtained approximately $371,000 from two senior citizens here in Williamsport. Those ladies, both stroke victims, ended up investing and receiving what Paul Mangiardi called PARCare certificates of investment, slips of paper like this

one here, for which they paid $371,000 in funds in total over an approximately two year period.

> Those funds, according to Paul Mangiardi's own assertions, were rolled into PARCare, were rolled into another company that he established, Bald Eagle Insurance.

(*Id.* at 27.) In its closing argument, the government again referred to Waltman and Fleming:

> Another carrier that was added to the list of reinsurers, and you could almost collect them like baseball cards in this case, is United Security Assurance. United Security Assurance was a company that Paul Mangiardi approached in 1988. Paul Mangiardi never sold one of their Medicare supplement policies, but tried to get a group together, a group with respect to this supplemental coverage that they marketed. He called the group PARCare, Inc. He provided a list to the president, Ron Landes, of United Security Assurance, and guess whose name is on it? One [sic.] of the names that are included on it are Ruth Waltman and Reba Fleming.

> We've heard in this case how Ruth Waltman and Reba Fleming were exploited by Paul Mangiardi. He obtained money from them to the tune of $327,000, if my memory serves me correctly, and deposited that money into the PARCare accounts. They appear on this beginning group that Paul Mangiardi was attempting to put together. Moreover, Maxicare was a product, Government Exhibit 7.4, that United Security Assurance marketed, and we find from Roger Needham's testimony that this brochure with the First Health logo at the top was being utilized by Paul and Eric Mangiardi in connection with the marketing of the health plan they pur-

portedly were trying to get people to buy.

(Trial Transcript, June 15, 1998, Rec. Doc. No. 571, at 81–82.)

■■■ The government's comments relating to Waltman and Fleming did not give rise to any misconduct, much less the kind that violates due process. First, contrary to Mangiardi's contention, the government never stated that PARCare was not in existence before Waltman and Fleming gave Mangiardi their money; in fact, it stated that PARCare was established in 1987—before Mangiardi obtained the money. Second, the government did not impermissibly make any false statements with respect to the character of Mangiardi's dealings with the two women. The challenged portion of the opening statement was merely an objective summary of evidence that the government reasonably expected to produce at trial. The government did indeed present evidence that Waltman and Fleming invested approximately $371,000 in PARCare. The challenged portion of the closing argument was a fair comment on the evidence that the government produced. Because the evidence in the record supported the inference that Mangiardi defrauded the women of their money, the government was free to argue that that was indeed the case. *See United States v. Green*, 25 F.3d 206, 210 (3d Cir.1994) (" '[T]he prosecutor is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence.' ") (quoting *United States v. Werme*, 939 F.2d 108, 117 (3d Cir.1991)); *United States v. Henderson*, 241 F.3d 638, 652 (9th Cir.2001) ("Prosecutors have considerable leeway to strike 'hard blows' based on the evidence and all reasonable inferences from the evidence.") (citations omitted). Third, the statements were not unduly inflammatory, and any remote chance of prejudice was negated by the court's instructions to the jury regarding statements of counsel and the overwhelming amount of evidence against Mangiardi. Finally, in passing, we note that to the extent Mangiardi challenges the admissibility of the evidence relating to Waltman and Fleming, his challenge is meritless in light of the Third Circuit's affirmance of the evidence's admissibility.

## C.  *Perjured testimony*

Mangiardi claims that the government committed misconduct by presenting the perjured testimony of John Bonner, who was one of Mangiardi's former attorneys, Robert Valois, to whom Mangiardi sold PARCare, and Joseph Lenahan, who was another of Mangiardi's attorneys. Mangiardi contends that Bonner perjured himself in two ways: (1) by falsely stating that he had no knowledge regarding the sale of PARCare to Valois; and (2) by testifying that he traveled to California in 1989 in order to secure reinsurance for PARCare, when in reality he made the trip because his son, Martin Bonner, was enduring legal troubles relating to drug trafficking. Mangiardi also asserts that Valois lied when he testified that he purchased PARCare for $186,000; in reality, according to Mangiardi, Valois paid significantly less. Finally, Mangiardi submits that Lenahan's testimony was inconsistent with his testimony from Mangiardi's first trial (although Mangiardi does not articulate what these inconsistencies were).

■■■ Although use of perjured testimony is a form of prosecutorial misconduct, it is analyzed under different rules which lessen the burden on defendants. In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where

the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. The rule pronounced in *Brady* applies when "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). While due process concerns are implicated in both, the standard for the granting of a new trial based on the use of perjured testimony is more lenient than the standard that deals with ordinary prosecutorial misconduct: " '[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Kyles v. Whitley,* 514 U.S. 419, 433 n. 7, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *Agurs,* 427 U.S. at 103, 96 S.Ct. 2392). "The same is true when the government, although not soliciting false evidence, allows it to go uncorrected when it appears at trial." *United States v. Biberfeld,* 957 F.2d 98, 102 (3d Cir.1992) (citing *Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)). This standard is properly used under § 2255. *See United States v. Bagley,* 473 U.S. 667, 671, 679–83, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Biberfeld,* 957 F.2d at 102 (3d Cir.1992).

■ Mangiardi does not come close to satisfying his burden. First, his assertions of the falsity of the testimony are supported by nothing more than his bald statements, which are insufficient. *See United States v. Coleman,* 805 F.2d 474, 483 (3d Cir.1986) (rejecting a defendant's claim that the government's witnesses pre-

sented perjured testimony where the claim was unsupported by the record). That some testimony may be inconsistent with that given in the first trial does not by itself constitute perjury. *See United States v. Thompson,* 117 F.3d 1033, 1035 (7th Cir.1997) ("[M]ere inconsistencies in testimony fall short of establishing perjury and most certainly do not establish that the government knowingly utilized perjured testimony.") (citation and internal quotation marks omitted); *United States v. Arnold,* Nos. 99–CV–5564, CRIM. 95–153–01, 2000 WL 288242, at *4 (E.D.Pa. March 20, 2000) (applying the rule recited in *Thompson* ). Next, even assuming that the testimony was false, Mangiardi's claim lacks merit because he fails to cite a reason why the government knew or should have known of that falsity. Finally, the testimony that Mangiardi claims was perjured was in all likelihood not a determinative factor in the jury's decision to convict. The sale of PARCare to Valois and Bonner's real reason for traveling to California were relatively unimportant details that almost certainly did not contribute to the verdict. For these reasons, Mangiardi's claim that the government presented perjured testimony lacks merit.

D. *Improper objection to the testimony of Don Bailey*

Mangiardi asserts both prosecutorial misconduct and court error relating to the exclusion of potential testimony to be given by Don Bailey, an attorney who represented Mangiardi at the beginning of the liquidation of West Branch Administrators, one of Mangiardi's companies. Bailey's representation of Mangiardi ended sometime around 1992, but the liquidation of West Branch Administrators did not end until 1998. At trial, Mangiardi sought to elicit testimony from Bailey regarding (1) the statutory liquidation procedures of the Pennsylvania Insurance Department; and

(2) a liquidation report issued in 1998 by the Insurance Department. The court did not allow the testimony, ruling that it was inadmissible because (1) Bailey was not being offered as an expert on Pennsylvania liquidation procedures; and (2) he ended his representation of Mangiardi years before the 1998 liquidation report and had no personal knowledge of any liquidation matters occurring after his representation.

■ Mangiardi argues that (1) the government committed prosecutorial misconduct by improperly objecting both at sidebar and in front of the jury to the admission of the testimony; and (2) the court erred in sustaining the government's objection. According to Mangiardi, "Bailey's testimony may have rattled the foundation of the government's case against Petitioner … had Mr. Bailey been permitted to speak on the subject of possible improper political motives regarding the Insurance Department's battle with Petitioner." (§ 2255 Motion, Rec. Doc. No. 624, at 30.) The court stands by its trial ruling and rejects Mangiardi's argument. Bailey was not being offered as an expert; thus any testimony relating generally to the statutory liquidation process was inappropriate. Bailey should not have been permitted to testify as to the liquidation report because he was unfamiliar with the document. The testimony would have been of marginal relevance anyway. In the unlikely event that any prosecutorial misconduct or court error did occur, it certainly did not rise to the level that warrants relief under § 2255.

### 3. *Sufficiency of the evidence regarding conspiracy*

Mangiardi apparently argues that his conviction for conspiracy is invalid because the conspiracy charge against Eric Mangiardi was dismissed after the jury failed to reach a unanimous verdict on that charge.

Mangiardi seeks relief under a doctrine known as the "rule of consistency," which "provides that where all alleged coconspirators save one are acquitted, the conviction of the remaining defendant must be vacated." *United States v. Velasquez,* 885 F.2d 1076, 1091 n. 13 (3d Cir.1989) (citing *Government of Virgin Islands v. Hoheb,* 777 F.2d 138, 140 (3d Cir.1985)). "The rule exists to prevent what would otherwise be logically inconsistent verdicts: a conviction premised on a finding that the defendant conspired with another person; and a jury finding that the government did not present sufficient evidence to prove that any other person was a member of that conspiracy." *Id.* The Third Circuit, while acknowledging the rule's existence, has not applied it or made it a part of a holding. *Id.*

The Third Circuit has suggested that the Supreme Court has cast doubt on the viability of the rule of consistency. *See id.* (citing *Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980); *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984)). According to the Court of Appeals, the Supreme Court has noted that inconsistent verdicts may be reached with respect to a single defendant because an acquittal does not necessarily mean that the jury found that the government did not sustain its burden. The acquittal could indicate rather that the jury was being lenient. *Id.* (citing *Powell,* 469 U.S. at 60–69, 105 S.Ct. 471).

■ We need not decide whether the rule of consistency is currently viable. Regardless of whether the rule is still in effect, it is inapplicable to the instant case. The jury did not reach inconsistent verdicts because Eric Mangiardi was not acquitted but received a hung jury.

A number of courts have held that the rule of consistency is inapplicable where one coconspirator is convicted while the only other possible coconspirator receives a hung jury. The District of Columbia Circuit has stated that " 'if charges are dismissed against all other coconspirators ... dismissal of charges against the remaining conspirator is not required.' " *United States v. Dakins,* 872 F.2d 1061, 1065 (D.C.Cir.1989) (quoting *United States v. Sachs,* 801 F.2d 839, 845 (6th Cir.1986)). In *United States v. Sangmeister,* 685 F.2d 1124 (9th Cir.1982), a jury convicted the defendant of conspiracy while being deadlocked with respect to the defendant's only possible coconspirator. While recognizing that the rule of consistency applies to conspiracies, *id.* at 1126, the court reasoned that the rule is inapplicable when one of the coconspirators receives a hung jury:

> As the hung jury is the failure of the jury to reach a verdict as to the coconspirator, we are not faced with inconsistent verdicts. We are disinclined to expand the rule of consistency in conspiracy judgments to situations in which there is a hung jury with respect to one co-conspirator.

*Id.* at 1127. *See also United States v. Sasser,* 974 F.2d 1544, 1559 (10th Cir.1992) ("We agree with the reasoning of both the Ninth Circuit and the District of Columbia Circuit. The failure of the jury to return a verdict on [a defendant's] coconspirators must be viewed as a nonevent that in no way affects [the defendant's] conviction for conspiracy.") (citing *Sangmeister,* 685 F.2d at 1126–27; *Dakins,* 872 F.2d at 1065); *United States v. Pratt,* 913 F.2d 982, 992 (1st Cir.1990) ("The rule of consistent verdicts does not ... apply where ... the jury has reached a guilty verdict on one defendant, but cannot arrive at a unanimous decision as to the only possible coconspirator.") (citing *United States v. Bucuvalas,* 909 F.2d 593, 597 (1st Cir.1990)).

We will follow the leads of these courts. Because Eric Mangiardi received a hung jury—which is properly viewed as a nonevent—Paul Mangiardi's conspiracy conviction is not inconsistent with the jury's determination with respect to Eric Mangiardi. Because we are not faced with inconsistent verdicts, the rule of consistency is inapplicable and Mangiardi's conspiracy conviction must stand.

Because Eric Mangiardi received a hung jury, the rule of consistency would be inapplicable even if Eric Mangiardi were Paul Mangiardi's only other possible coconspirator. The superseding indictment, however, charges that "Paul J. Mangiardi, Eric K. Mangiardi, Walter Regula, and co-conspirator William J. Contino did knowingly and willfully combine, conspire, confederate and agree with each other, and other persons *both known and unknown to the Grand Jury ....*" (Superseding Indictment, Rec. Doc. No. 130, at 13) (emphasis added). When an indictment alleges that a defendant conspires with persons both known and unknown to the grand jury, "the government [needs] to show only that [the defendant] conspired with 'someone—anyone.' " *United States v. Pressler,* 256 F.3d 144, 148 (3d Cir.2001) (quoting *United States v. Obialo,* 23 F.3d 69, 73 (3d Cir.1994)); *see also United States v. Wright,* 845 F.Supp. 1041, 1058 (D.N.J. 1994), *aff'd sub nom.,* 46 F.3d 1120 (3d Cir.1994). This rule derives from a line of cases that holds that where an indictment charges that a defendant conspires with persons whose names are known and unknown to the grand jury, " 'the identity of the other members of the conspiracy is not needed, inasmuch as one person can be convicted of conspiring with persons whose names are unknown.' " *Obialo,* 23 F.3d at 72 (quoting *Rogers v. United States,* 340 U.S. 367, 375, 71 S.Ct. 438, 95 L.Ed. 344 (1951)); *see also United States v. Allen,*

613 F.2d 1248, 1253 (3d Cir.1980); *Hoheb,* 777 F.2d at 141.

The government was required to prove only that Mangiardi conspired with someone—anyone. If the government could satisfy its burden by proving that Mangiardi conspired with unknown, unnamed individuals, then certainly the government could sustain its burden by proving that Mangiardi conspired with Contino, who was explicitly mentioned in the indictment as a coconspirator. There was sufficient evidence at trial that Mangiardi did indeed conspire with Contino. Thus, even aside from Eric Mangiardi's role in the scheme, Paul Mangiardi's conviction must not be disturbed.

### 4. *Coerced verdict*

Mangiardi argues that his guilty verdict was the product of jury coercion. On June 18, 1998, the jury entered a verdict of guilty as to Paul Mangiardi, but remained deadlocked as to Eric Mangiardi. Paul Mangiardi points out that the court adjourned early that day in light of a juror's sudden medical emergency, and that the court that same day instructed the jury that it was free to render a partial verdict, i.e., a verdict as to either defendant alone as opposed to both Paul Mangiardi and Eric Mangiardi. According to Mangiardi, by adjourning early on June 18 after giving the supplemental instruction on a partial verdict, the court set a deadline and coerced the jury into entering a partial verdict by the end of deliberations that day.

On the morning of June 18, during deliberations, the court was informed that juror Kenneth Best needed on that afternoon to attend a medical appointment in connection with a job-related physical that he took during the course of the trial. (Trial Transcript, June 18, 1998, Rec. Doc. No. 574, at 3.) The court, with the agreement of counsel, planned to tell the jury to deliberate until 1:00 PM and then to adjourn for the day at 1:30 PM. (*Id.*) The court also announced its intention to instruct the jurors that they had the option to enter a partial verdict, which in reality would be a complete verdict as to either Paul Mangiardi or Eric Mangiardi. (*Id.* at 3–4.)

Sometime after the jury entered, the following took place:

THE COURT: Now I understand, Mr. Best, you have an appointment this afternoon, right?

MR. BEST: Yes, sir.

THE COURT: And we certainly want to accommodate that, as I understand it's of an emergency nature. So what I'm suggesting to you is that you deliberate until 1:00, and then go home for the day, everybody, because we need to allow time for him to leave and get over to Montoursville and then attend to all of that, and who knows how long that would take and when you would get back, and we can't have 11 of you doing anything without Mr. Best.

So that would be my suggestion; we have a short day from 10:00 until 1:00, and then you would be on your own. We would not have a group luncheon or anything like that. You can all go home or do whatever you want to do, but the deliberations would be finished at that time for the day, and I would have you back in here again just to say good-bye to you, and then we'll resume again at 10:00 tomorrow if you have not reached a verdict this morning.

Now, in that connection, I did not indicate to you when you went out to start deliberating that you may, if you wish, render a partial verdict at any time with respect to one of the Defendants. I'm not suggesting that you should do that, but you may do that. By

that I mean, if you have unanimously reached a verdict as to all counts against an individual Defendant, you may record that, sign it, let us know, and we'll have you in and enter that verdict.

So if you unanimously agreed as to a verdict against—with respect to the charges against Paul Mangiardi, and that would be all 16 counts, then you could indicate that, and we would take that verdict. By the same token, if you agreed unanimously with respect to a verdict of either guilty or not guilty with respect to Eric Mangiardi on the one count against him, and you wished to render that partial verdict as to either of them, then you may do that.

So, again, I'm not suggesting that you should or that you would be able to, or anything like that, but that is something you may do if you choose to do that. So I'm going to have the clerk give you another copy of the verdict slip so that you would have, if you did that, you would have one that pertained only to one Defendant, and then you can keep the other one for the other Defendant.

But as I say, I'm not urging you to do that at all. It would be—I don't know whether it's better or not, but the normal course of events, of course, is to render a verdict on everybody at the same time, the two involved here.

(*Id.* at 5–7.) The jury was then excused to resume deliberations.

Later that day, the jury submitted to the clerk several notes. One note was from Best and asked what would happen if he would be unable to return to the jury. Another note indicated that the jury had reached a partial verdict. The court decided to first receive the partial verdict and then address the concerns raised by Best. (*Id.* at 10, 11.)

Later, the jury entered and read its partial verdict. It found Paul Mangiardi

guilty of all 16 counts of the superseding indictment. (*Id.* at 12.) The court then explained to the jury that in the event that Best could not return, the jury could, consistent with the Federal Rules of Criminal Procedure, continue with 11 members if the parties so agreed or the court found just cause. After directing Best to later that afternoon inform the clerk as to his status for the next day, the court excused the jury. (*Id.* at 17–18.)

The Supreme Court has observed that "[a]ny criminal defendant ... being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps,* 484 U.S. 231, 241, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). Two related Third Circuit cases are particularly instructive on the issue of jury coercion based on judicially-imposed deadlines. *See United States v. Graham,* 758 F.2d 879, (3d Cir. 1985); *United States v. Grosso,* 358 F.2d 154 (3d Cir.1966), *rev'd on other grounds,* 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968).

Because *Grosso* is a case on which *Graham* relies, it deserves first discussion. In *Grosso,* one of the jurors became ill during deliberations and was examined by a physician. The district court planned to continue deliberations even though the juror was ill. Defense counsel moved for a mistrial on the grounds that further deliberations "might result in some sort of a compromise verdict." The court denied defense counsel's motion. During the subsequent deliberations, the jury sent to the court a note that indicated that it was deadlocked. The court instructed the bailiff to tell the jurors, "I have got their message and I suggest they keep on working." The jury ultimately convicted the defendant.

On appeal, the defendant argued that the verdict was void because "under the

circumstances of [that] case the prolonged confinement of the jury, coupled with the illness of the juror, constituted duress." *Grosso*, 358 F.2d at 159. The Third Circuit disagreed. It held that " '[t]he length of time a jury may be kept together for the purpose of the deliberation is a matter within the discretion of the trial judge, and his action in requiring further deliberation after the jury has reported a disagreement does not, without more, constitute coercion.' " *Id.* at 159 (citations omitted). The court recognized that requiring further deliberation after a jury disagreement, when accompanied by other circumstances, may be coercive. *Id.* at 160 (citation omitted). It then stated that "the illness of a juror may be regarded as such a circumstance, but only where it appears from the evidence that the verdict was induced by the juror's condition." *Id.* The court found no evidence that the verdict was induced by the juror's condition, and thus rejected the defendant's argument. *Id.*

*Graham*, like the instant case, featured the argument that the district court imposed a deadline for reaching a verdict. During trial and two days before deliberations began, the court received a note from a juror asking that the jurors on Friday be dismissed by 4:00 PM because the Jewish holiday of Yom Kippur commenced on Friday night. The court did not respond directly to this request, and no member of the jury ever raised the issue again. On the Friday morning, the jury indicated that it was deadlocked as to a number of charges. The court gave the jury a supplemental instruction that addressed the jury's deadlock. Despite defense counsel's request that the court include in the supplemental charge that the jury was not required to consider 4:00 Friday as a deadline, the court did not address specifically the 4:00 departure time but did state that "There are no time deadlines within which you must reach your verdict." At 3:20 PM

that day, the jury announced that it had reached a verdict as to some but not all of the charges.

On appeal, the defendant argued, among other things, that the jurors were coerced because they were not made sufficiently aware that they were not required to meet through the evening and therefore believed that they were required to conclude deliberation prior to the start of the holiday.

The court rejected the defendant's argument. It reaffirmed *Grosso's* holding that requiring further deliberation after a disagreement does not, without more, constitute coercion. *Graham*, 758 F.2d at 884. Next, analogizing to *Grosso*, it found that the jury's verdict was not coerced because there was no evidence that the verdict was influenced by the impending holiday. *Id.* at 885. That is, the impending holiday was not an example of "other circumstances" that, when added to the instruction to continue, would create a coercive environment. *See Grosso*, 358 F.2d at 160.

The *Graham* court then offered an analysis separate from the *Grosso* court:

> While some courts have found the length of time the jury was made to deliberate, [sic] to be coercive, these cases have involved *affirmative* coercive conduct of the district court, such as reminding the jury that the weekend was approaching, or creating the impression that the jury would be locked up all night. No such affirmative coercive conduct occurred in this case and, absent evidence that the jury was influenced by a prescribed deadline or the approaching holiday, the court's mere failure to respond to a juror's request cannot be deemed coercive.

*Graham*, 758 F.2d at 885 (citations omitted).

*Graham* and *Grosso* teach that when a jury is faced with a logistical concern (such as a juror's illness or an impending holiday), a court's supplemental instruction that the jury nevertheless continue to deliberate will not be deemed coercive unless there is evidence that the logistical concern influenced the verdict by, for example, contributing to the illusion of a judicially-imposed deadline. *Graham* could arguably be read to indicate that coercion may be found based only on the length of time the jury was made to deliberate, provided that the court engages in *affirmative* coercive conduct as opposed to simply ignoring a juror's request. However these considerations are related, it is clear that in the instant case there was no coercion under either *Graham* or *Grosso*. The court instructed the jurors that they would continue to deliberate notwithstanding Best's medical condition, but there is no evidence that Best's condition influenced Best individually or the jury as a whole. Best did not tell the court that he could not fully deliberate, and no other juror expressed concern about the situation. The jurors could have waited to hear the court's instructions regarding Best before announcing that they had reached a verdict; instead, they chose to announce their verdict even while they were unsure of what would occur with respect to Best. This supports the proposition that the jurors were not influenced by Best's condition. *Cf. Graham*, 758 F.2d at 884. The court did not engage in any affirmative coercive conduct relating to the length of the jurors' deliberations, as it simply excused the jurors for the day with the intention to resume deliberations the following day. The court's instruction that the jurors had the discretion to enter a partial verdict can hardly be characterized as affirmative coercive conduct, as no deadline was mentioned and the court repeatedly informed the jurors that they were not required at all to render a partial verdict. Mangiardi cannot successfully claim that his verdict was the product of coercion.

Some unrelated but important rulings are necessary. To the extent that Mangiardi contends that Best should have been found to be biased on the basis of his medical condition, his argument is rejected consistent with our discussion above. To the extent that Mangiardi argues that Best should have been excused at the start of deliberations, his argument is meritless, as the court properly exercised its discretion to retain a jury of twelve. *See* Fed. R.Crim.P. 23(b).

### 5. *Statute of limitations*

Mangiardi contends that the superseding indictment is barred by the statute of limitations. The court already has considered and rejected this argument. (*See* Memorandum issued April 21, 1997, at 3–4 and Order # 1 issued April 21, 1997, Rec. Doc. No. 214.)

### 6. *Claim Based on Apprendi*

Mangiardi raises a claim based on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). We need not discuss the merits of Mangiardi's argument because his claim is procedurally barred. The benefit of the *Apprendi* decision is not available to a § 2255 movant whose conviction became final before June 26, 2000, the date *Apprendi* was issued. *See In re Turner*, 267 F.3d 225, 227 (3d Cir.2001) (announcing that the Supreme Court has not made *Apprendi* retroactive to cases on collateral review) (citing *Tyler v. Cain*, 533 U.S. 656, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001)). The Third Circuit affirmed Mangiardi's conviction on October 27, 1999 and the Supreme Court denied his petition for a writ of certiorari on April 3, 2000. Because Mangiardi's conviction became final before June 26, 2000, he cannot

raise an *Apprendi* claim in a motion under § 2255. *Accord United States v. Jones,* Nos. CR. 95–124–5, CIV. A. 99–3976, 2001 WL 1173980, at *11 (E.D.Pa. October 3, 2001) (holding that *Turner* precluded an *Apprendi* claim under § 2255 because the defendant's conviction became final before the issuance of *Apprendi* ).

## CLAIMS FOR INEFFECTIVE ASSISTANCE OF COUNSEL

To successfully present a claim of ineffective assistance of counsel, a defendant must establish that (1) the performance of counsel fell below an objective standard of reasonableness; and (2) the errors of counsel prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687–688, 691–692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Both *Strickland* prongs must be satisfied." *George v. Sively,* 254 F.3d 438, 443 (3d Cir.2001) (citing *United States v. Nino,* 878 F.2d 101, 104 (3d Cir.1989)). The *Strickland* test is applicable to claims for ineffective assistance of appellate counsel. *United States v. Mannino,* 212 F.3d 835, 840 n. 4 (3d Cir. 2000) (citations omitted).

The first prong requires the defendant to "establish . . . that counsel's performance was deficient." *Jermyn v. Horn,* 266 F.3d 257, 282 (3d Cir.2001). "This requires showing that counsel was not functioning as the 'counsel' guaranteed defendant by the Sixth Amendment." *Id.* (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052) (internal quotation marks omitted). "In assessing counsel's performance, 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* (quoting *Strickland,* 466 U.S at 689, 104 S.Ct. 2052). "There is a 'strong presumption' that counsel's performance was reasonable." *Id.* "That is to say, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (quoting *Berryman v. Morton,* 100 F.3d 1089, 1094 (3d Cir.1996) (in turn quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052)).

The second prong requires the defendant to "demonstrate that he was prejudiced by counsel's errors." *Id.* (citing *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052). "The [movant] must show that 'there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). "A 'reasonable probability' is 'a probability sufficient to undermine confidence in the outcome.' " *Id.* (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). "This standard 'is not a stringent one;' it is less demanding than the preponderance standard." *Id.* (quoting *Baker v. Barbo,* 177 F.3d 149, 154 (3d Cir.1999)). "[A] court must consider the strength of the evidence in deciding whether the *Strickland* prejudice prong has been satisfied." *Buehl v. Vaughn,* 166 F.3d 163, 172 (3d Cir.1999). " '[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.' " *Id.* (quoting *Strickland,* 466 U.S. at 696, 104 S.Ct. 2052).

Mangiardi's first six claims for ineffective assistance of counsel—(1) the failure to challenge the jurors for cause; (2) the failure to object to the "shark" reference; (3) the failure to object to the statements and evidence regarding Fleming and Waltman; (4) the failure to object to the Lenahan's perjured testimony; (5) the failure to object to the coerced verdict; and (6) the failure to raise with the court the issue of

the statute of limitations—may quickly be considered and rejected.

■ Because the jury was not biased, counsel was not ineffective for failing to challenge the jurors for cause. *See United States v. Gibbs*, 125 F.Supp.2d 700, 709 (E.D.Pa.2000) (finding that because § 2255 movant's claim of juror bias was meritless, counsel was not ineffective for failing to move to strike for cause certain jurors); *United States v. Riddick*, 15 F.Supp.2d 673, 681 (E.D.Pa.1998) (finding that because § 2255 movant could not show any juror bias, he could not show that counsel was ineffective for failing to move for a mistrial on the grounds of bias).

■ As shown above, the challenged statements by the prosecution were of little consequence, the evidence regarding Fleming and Waltman was admissible, and there is no indication that the prosecution offered any perjured testimony. The Third Circuit has decreed that "if there is no merit to [a defendant's] claims that the prosecution's statements [or evidence] should not have been permitted at trial, [defense] counsel cannot be deemed ineffective for not having objected to their presentation, as it was not unreasonable for him to acquiesce in the presentation of proper statements and testimony." *Hartey v. Vaughn*, 186 F.3d 367, 372 (3d Cir. 1999). Thus, Mangiardi cannot satisfy *Strickland's* "cause" prong. Further, as counsel's challenged conduct was relatively insignificant, Mangiardi cannot show that he was prejudiced by any of counsel's omissions.

The verdict was in no way coerced. Therefore, counsel was not ineffective for failing to raise this issue with the court. *See Kelley v. Farley*, 905 F.Supp. 571, 577 (N.D.Ind.1995) (finding that counsel was not ineffective when he failed to object to the court's allegedly coercive statements to the jury, where the statements were found not to have been coercive).

Finally, trial counsel did in fact argue that the statute of limitations barred the superseding indictment. Counsel filed a motion to dismiss, which the court considered and denied. Counsel was not ineffective for failing to raise this issue because he did raise the issue.

### 7. Failure to call witnesses

■ Mangiardi contends that trial counsel was ineffective for failing to call a number of witnesses, including police officers, an accountant, employees of the Pennsylvania Insurance Department, and certain character witnesses. "[W]here a [§ 2255 movant] claims his trial counsel failed to call a witness, he must make a specific showing as to what the evidence would have been, and prove that this witness's testimony would have produced a different result. Otherwise, the prejudice prong under *Strickland* is not satisfied." *United States v. Edwards*, No. CRIM. 96-592, 2000 WL 572704, at *5 (E.D.Pa. May 8, 2000) (citations and internal quotation marks omitted). Mangiardi makes a number of conclusory statements as to how these witnesses would have helped him at trial, but nowhere does he adequately explain specifically what the testimony would have been or discuss why the result of his trial would have been different had any of the witnesses been called. Accordingly, trial counsel cannot be deemed ineffective. We note also that the government has provided the court with defense counsel's reasoning with respect to calling the witnesses mentioned in Mangiardi's argument. Counsel indicates that none of the witnesses would have been helpful, and that some would have been detrimental to Mangiardi's case. (*See* Defense Counsel's Response to Mangiardi's § 2255 motion, Exhibit 1 to Government's Brief, Rec. Doc.

No. 644, at 1–4.) Mangiardi fails to defeat the presumption that counsel's decisions were based on sound trial strategy.

### 8. *Failure to qualify witnesses as experts*

Mangiardi argues that trial counsel was ineffective because he did not qualify as experts attorneys Bailey, Allen Paglia, and Albert Meyer. Each of the three attorneys gave Mangiardi advice as to certain phases of his businesses, and each testified at trial. Mangiardi does not sufficiently articulate exactly why trial counsel was ineffective or how expert testimony from any of the witnesses would have helped him. In any event, it is difficult to conceptualize how qualifying any of the attorneys as experts would have assisted Mangiardi's cause.

As stated above, Bailey represented Mangiardi at the beginning of the liquidation phase of West Branch Administrators, a period outside the scope of the indictment. Mangiardi suggests that Bailey could have testified as to the alleged improprieties and hidden agenda within the Pennsylvania Insurance Department. Even if Bailey would have offered this testimony, it would not have changed the fact that Mangiardi's companies were underfunded. Bailey himself admitted that he was unaware of any funds—other than those seized from West Branch Administrators—that could have been used to pay health care claims.

Defense counsel elicited from Paglia and Meyer all of the testimony that they were capable of providing. Each was examined as to the legal advice given to Mangiardi on the operation of West Branch Administrators. It is unclear how any expert testimony would have changed things. Of course, expert testimony on legal matters is generally disfavored any-

way. *See Nieves–Villanueva v. Soto–Rivera*, 133 F.3d 92, 99–101 (1st Cir.1997).

Mangiardi has failed to satisfy either *Strickland* prong. Counsel was not unreasonable in failing to qualify these witnesses as experts, and counsel's omission did not prejudice Mangiardi. The overwhelming evidence against Mangiardi even further lessens his claim of prejudice.

### 9. *Refusal to permit Mangiardi to testify*

Mangiardi makes a number of assertions regarding trial counsel's interference with his right to testify at trial. It is unclear whether he alleges that counsel refused to let him testify or that counsel erroneously persuaded him not to testify. The trial record, the government's exhibits, and even a portion of Mangiardi's brief arguably indicate that Mangiardi followed counsel's advice and voluntarily elected not to testify, but Mangiardi presents affidavits illustrating that trial counsel refused to let him testify despite his wishes to do so. "[T]he right to 'testify on one's own behalf at a criminal trial' is grounded in ... the Constitution." *United States v. Leggett*, 162 F.3d 237, 245 (3d Cir.1998) (quoting *Rock v. Arkansas*, 483 U.S. 44, 51, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)). "The right is personal and can be waived only by the defendant, not defense counsel." *Id.* (citing *United States v. Pennycooke*, 65 F.3d 9, 10 (3d Cir.1995)). Because a claim that counsel denied Mangiardi's request to testify "would at least be colorable," *Leggett*, 162 F.3d at 249 n. 12 (citation omitted), we will hold an evidentiary hearing on this issue. A hearing is necessary to resolve the factual ambiguities of Mangiardi's claim, which will in turn allow us to apply the proper legal framework and ensure the protection of his constitutional rights. We will defer further analysis under *Strickland* until af-

ter the hearing. *See United States v. Rodriguez*, 153 F.Supp.2d 590, 595 (E.D.Pa.2001) (reserving analysis under *Strickland* until the court could hold an evidentiary hearing on the defendant's § 2255 claim that trial counsel refused to let him testify).

### 10. *Failure of appellate counsel to raise issues on appeal*

Mangiardi asserts that his appellate counsel was ineffective for not raising on appeal every claim listed in the instant motion.

■■ "To show that appellate counsel was deficient [under *Strickland*], [a defendant] must do more than show that counsel failed to raise every non-frivolous issue, for an appellate counsel is under no obligation to raise all issues, but may pick and choose so as to maximize the chances of a successful appeal." *See United States v. Williams*, 166 F.Supp.2d 286, 305 (E.D.Pa. 2001) (citing *Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000)) (other citation omitted). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance be overcome." *Smith*, 528 U.S. at 288, 120 S.Ct. 746 (citation and internal quotation marks omitted). To establish prejudice on a claim for ineffective assistance of counsel, the defendant must show that "there is a reasonable probability that the result of the *appeal* would have been different had counsel stewardship not fallen below the required standard." *Mannino*, 212 F.3d at 845 (emphasis in original).

With the possible exception of his claim that he was not permitted to testify, Mangiardi has not satisfied either prong of the *Strickland* test.

Because each of Mangiardi's claims relating to the proceedings is meritless, appellate counsel was not unreasonable for any failure to raise any of them on direct appeal. *See Williams*, 166 F.Supp.2d at 305 (finding that where each of the claims raised in the defendant's § 2255 motion was meritless, appellate counsel was not deficient for failing to raise them on direct appeal). The same reasoning applies to appellate counsel's failure to raise Mangiardi's claims for ineffective assistance of trial counsel. *See id., James v. Superintendent of SCI Huntington*, No. CIV.A. 97–2864, 2000 WL 5196, at *3 (E.D.Pa. January 4, 2000) (holding that where trial counsel was not ineffective, appellate counsel was not ineffective for failing to raise claim of ineffectiveness of trial counsel). Moreover, as discussed above, claims for ineffective assistance of counsel are properly raised for the first time in a motion under § 2255.

Mangiardi likewise has not shown any prejudice resulting from the conduct of appellate counsel. Because Mangiardi's claims are baseless, he cannot establish any likelihood of success on appeal; he thus fails to satisfy a prerequisite for the demonstration of prejudice under *Strickland. See Williams*, 166 F.Supp.2d at 305 (finding that where all of the defendant's claims were meritless, there was no likelihood of success on appeal, and the defendant did not show prejudice) (citing *Mannino*, 212 F.3d at 845). Even if any of Mangiardi's claims had any merit, the prejudice prong could not be satisfied, as the substantial evidence against him would likely have caused any error to be deemed harmless. *See Williams*, 166 F.Supp.2d at 305.

Because Mangiardi has not satisfied either prong of the *Strickland* test, his claim for ineffective assistance of appellate counsel fails. We emphasize that this decision does not pertain to Mangiardi's claim relating to his failure to testify. After the

aforementioned evidentiary hearing, we will revisit that claim in the context of ineffective assistance of appellate counsel.

### CONCLUSION:

With the possible exception of his claim relating to his failure to testify at trial, we find that every one of Mangiardi's claims lacks merit. Whether considered individually or collectively, the alleged trial errors and examples of ineffective assistance of counsel did not rise to the level that warrants relief under § 2255. The court will hold an evidentiary hearing relating to Mangiardi's failure to testify at trial. Otherwise, Mangiardi's § 2255 motion will be denied. An appropriate order follows.

### ORDER

**IT IS ORDERED THAT:**

1. An evidentiary hearing is scheduled for December 18, 2001, at 9:30 a.m., in Courtroom No. 2, Fourth Floor, Federal Building, 240 West Third Street, Williamsport, Pennsylvania, solely on the issue raised in Mangiardi's § 2255 motion regarding his failure to testify at trial.

2. In accordance with Rule 8(c) of the Rules Governing Section 2255 Proceedings for the United States District Courts, the court will appoint counsel for Mangiardi for the sole purpose of representing Mangiardi in connection with the hearing scheduled in paragraph 1 of this order.

3. As the Federal Public Defender has a conflict of interest, the Federal Public Defender is directed to refer the case to a member of the CJA panel and to notify the Court forthwith of such referral.